VILLANTI, Judge.
 

 Jeffrey Green appeals his convictions and sentences for one count of first-degree felony murder, one count of armed burglary of a dwelling, and one count of armed robbery. We reverse and remand for a new trial because the trial court erred in denying Green’s motions for mistrial predicated on the prosecutor’s improper comments concerning Green’s exercise of his right to remain silent.
 

 Background Facts
 

 Robert Cameron was shot and killed by a masked gunman who entered Cameron’s second-floor condominium through a balcony door. Through investigation, the police developed three men as possible suspeets, Kelly Washington, Antonio Neal, and Desmond Davis, each of whom had been to Cameron’s condominium to socialize in the weeks before the shooting. During post-
 
 Mimnda
 

 [1]
 

 statements to police, Washington, Neal, and Davis implicated Henry Jones and Jeffrey Green in the shooting.
 

 According to the testimony presented at trial, Washington, Neal, and Davis knew that Cameron kept large quantities of marijuana at his condominium, and they decided to rob him of the marijuana and the cash associated with sales of that marijuana. The three then contacted Jones about obtaining a firearm. At Jones’s suggestion, the four men went to Green’s house and obtained two handguns. Green joined the group, and the five men drove to a spot near Cameron’s condominium. Washington waited in the car while Neal, Davis, Jones, and Green got out and jumped the wall surrounding the condominium complex. According to Davis, he and Neal boosted Jones and Green onto the second-floor balcony of Cameron’s condominium. According to Jones, Green shot Cameron when he initially refused to give them the marijuana and the cash. After being shot, Cameron got the marijuana and cash from his closet and gave it to Green. Both Jones and Green then fled the apartment. They rejoined Neal and
 
 *734
 
 Davis, ran back to the car where Washington was waiting, and returned to Green’s home. According to Davis, at Green’s house the five men divided the marijuana and the cash between them. They also allegedly each signed a piece of paper saying that none of them would tell anyone what had happened, although no one other than Davis testified to this and no such paper was ever found or introduced at trial.
 

 According to Davis and Jones, while the five men were dividing the marijuana and cash Green admitted that he had fought with someone in the condominium and the gun went off and that person was shot. However, Neal testified that he had no idea that any shooting had occurred until the next day when Jones told him that Green had shot someone. Neal also testified that Green told him that Jones was the one who fired the shot.
 

 Post-arrest, Davis confessed his involvement in the offenses to the police. In exchange for his cooperation, he was offered a plea agreement that included a ten-year cap on prison time. During Davis’s trial testimony, he was impeached with various lies that he told in his sworn statements to the police. His testimony was also impeached by the fact that the police had told him the substance of his codefendants’ statements before the police recorded his statement. Thus, the evidence showed that when Davis’s statement was recorded, he knew what the other alleged participants had told the police about the events.
 

 Jones turned himself in to police after he learned that there was a warrant out for his arrest. In exchange for his cooperation and confession, he was offered a plea agreement that included a sentence of fifteen years in prison followed by three years’ probation. During his trial testimony, Jones was impeached with various lies that he told in his sworn statements to the police. Like Davis, Jones was also impeached by evidence that the police had told him the substance of his codefendants’ statements before the police recorded his statement.
 

 Neal initially told the police that he was not with the others on the night in question. However, he later confessed to some involvement after the police told him that both Jones and Green had pointed to him as the triggerman. In exchange for his cooperation and confession, Neal was offered a plea agreement with a sentence of ten years in prison followed by three years’ probation. Like Davis and Jones, Neal’s confession was impeached by the fact that the police told him the substance of his codefendants’ statements before they recorded his statement.
 

 After Green turned himself in to the police, he asserted his right to remain silent and chose not to give a statement to the police. Despite Green’s silence, the police told at least one codefendant— Neal — that Green had given a statement that detailed everyone’s involvement in the robbery and shooting.
 

 Several days after the shooting, the police obtained a search warrant for Green’s residence based on the statements of his codefendants. At Green’s home, the police recovered three .380 firearms similar to the one allegedly used to shoot Cameron. However, forensic testing revealed that none of the three firearms fired the bullet that killed Cameron, and no other shots were fired during the burglary. Moreover, despite statements from Neal and Davis that Green’s Dodge Charger was the vehicle the men used to get to and from Cameron’s condominium on the night of the shooting, the police never obtained a search warrant for the Charger and they never conducted any forensic testing on the Charger. The State found no finger
 
 *735
 
 prints at Cameron’s condominium connecting Green to the robbery, and the two other men present in Cameron’s condominium at the time of the robbery could not identify either of the intruders. Thus, the State had no physical evidence or eyewitness identification tying Green to the crimes. Instead, the only evidence tying him to any of the events was the testimony of Neal, Davis, and Jones. Washington did not testify at trial.
 

 Green’s theory of defense was that he was not involved in these crimes at all and that his codefendants had accused him of the shooting to cover up their own involvement. He pointed out that each codefen-dant had initially lied to the police about their respective involvement and had changed their stories only after being told what the other codefendants had allegedly told police. He also argued that the code-fendants each had a motive to minimize their own involvement due to their favorable plea agreements. Despite these arguments, the jury convicted Green as charged, and the court sentenced him to three concurrent terms of life in prison.
 

 In this appeal, Green raises three issues for review. We reject without discussion Green’s argument that the trial court abused its discretion when it allowed Neal and Jones to testify even though they had refused to give depositions prior to trial. However, we agree with Green that he was entitled to a mistrial based on the prosecutor’s improper comments and arguments concerning the exercise of his right to remain silent. In addition, because we are remanding for a new trial, we also explain why the trial court abused its discretion in admitting evidence of the firearms found at Green’s residence that were unrelated to the charged crimes.
 

 Post-Arrest Silence
 

 Green first argues that he was entitled to a mistrial because the prosecutor improperly elicited evidence concerning Green’s decision not to make a statement to police and then improperly relied on this evidence during closing arguments. During the redirect examination of Detective Kent, the prosecutor asked whether Green had given any post-arrest statements to law enforcement. Kent replied that Green had “refused.” Despite this obvious comment on Green’s exercise of his right to remain silent, the trial court denied Green’s motion for mistrial. Later, during closing arguments, the prosecutor listed each of Green’s codefendants, noted that each had confessed post-arrest, and then argued, ‘When Jeffrey Green was given an opportunity to talk to the police, he refused.” Green again moved for a mistrial, and the trial court again denied the motion. These rulings constituted an abuse of discretion.
 

 The due process clause of the Florida Constitution, article I, section 9, guards against prosecutorial comments on a defendant’s post-arrest silence.
 
 See State v. Hoggins,
 
 718 So.2d 761, 770 (Fla.1998). The standard for determining what constitutes a comment on post-arrest silence is fairly liberal. “If the comment is fairly susceptible of being construed by the jury as a comment on the defendant’s exercise of his or her right to remain silent, it violates the defendant’s right to silence.”
 
 Id.
 
 at 769;
 
 see also State v. DiGuilio,
 
 491 So.2d 1129, 1135 (Fla.1986). Thus, “Evidence or argument that is fairly susceptible of being deemed a comment on the right of silence should be excluded.”
 
 Giorgetti v. State,
 
 821 So.2d 417, 422 (Fla. 4th DCA 2002);
 
 see also State v. Smith,
 
 573 So.2d 306, 317 (Fla.1990) (“[Cjourts must prohibit all evidence or argument that is fairly susceptible of being interpreted by the jury as a comment on the right of silence.”);
 
 Dixon v. State,
 
 627 So.2d 19, 20 (Fla. 2d DCA 1993) (holding that com
 
 *736
 
 ments that are “fairly susceptible” to being interpreted as comments on the defendant’s silence are generally reversible error).
 

 Here, Detective Kent’s response that Green “refused” to give a statement was more than “fairly susceptible” of being interpreted as a comment on Green’s right to remain silent. Instead, it directly raised and negatively commented on Green’s exercise of that constitutional right. As such, the response was an improper comment that should have been excluded from both evidence and argument.
 

 In defense of the trial court’s ruling otherwise, the State argues that Green “opened the door” to this comment and argument when he elicited testimony from Neal that the police told Neal before Neal confessed that Green had given a statement identifying Neal as the triggerman. Neal testified that he later learned that Green had not made a statement to the police. The State argued that since Green himself had elicited the testimony that he had not given a statement to the officers, he had “opened the door” to the State using this information against Green.
 

 “[T]he concept of ‘opening the door’ allows the admission of otherwise inadmissible testimony to ‘qualify, explain, or limit’ testimony or evidence previously admitted.”
 
 Ramirez v. State,
 
 789 So.2d 568, 579 (Fla.1999) (quoting
 
 Tompkins v. State,
 
 502 So.2d 415, 419 (Fla.1986)). Applying this concept in the context of post-arrest silence, if a defendant raises the issue of his own post-arrest silence, the State may respond.
 
 See United States v. Robinson,
 
 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988);
 
 Ricardo v. State,
 
 756 So.2d 215, 216 (Fla. 4th DCA 2000);
 
 Wood v. State,
 
 552 So.2d 235, 236 (Fla. 4th DCA 1989). However, the extent and content of the State’s response is limited to a fair comment on the evidence of silence raised by the defendant.
 
 See Ricardo,
 
 756 So.2d at 216;
 
 Wood,
 
 552 So.2d at 236. Any comments that exceed the extent and content of the evidence elicited by the defendant remain objectionable.
 

 Here, the testimony presented by Green did not “open the door” to the comments elicited by the State. As to the response elicited from Detective Kent, nothing about her testimony that Green “refused” to give a statement either qualified, explained, or limited Neal’s prior testimony that the police told him that Green had made a statement implicating him when, in fact, Green had made no such statement. In addition, Green’s questions to both Neal and Detective Kent were narrowly tailored to elicit only testimony that would establish that the officers “set up” the codefendants against each other. Green then used this evidence to establish a possible motive for Neal to falsely accuse Green of being the triggerman. Given these narrowly tailored questions, the subsequent testimony from Detective Kent that Green “refused” to give a statement was not a fair comment on the evidence elicited by Green concerning his own post-arrest silence, and it should have been excluded.
 

 Moreover, the State’s argument in closing that Green was the only one of the codefendants to not make a statement to the police was an egregiously improper comment on Green’s exercise of his right to remain silent. “Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant’s silence, ... the privilege against compulsory self-incrimination is violated.”
 
 Robinson,
 
 485 U.S. at 32, 108 S.Ct. 864. Here, nothing about the limited evidence elicited during Green’s cross-examination of Neal opened the door to the expansive argu
 
 *737
 
 ment made by the State. The State’s argument was a blatant appeal to the jury to convict Green because he was the only one of the codefendants who did not confess. This argument went far beyond the extent and content of the testimony elicited by Green, and Green’s motion for mistrial based on this improper argument should have been granted.
 

 We also reject the State’s argument that any error arising from these comments was harmless. An error is harmless only when “the state, as the beneficiary of the error, [can] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict.”
 
 DiGuilio,
 
 491 So.2d at 1138. As a general proposition, “[w]hen the evidence against the defendant is not clearly conclusive, comment on postarrest silence is not harmless.”
 
 Hoggins,
 
 718 So.2d at 772;
 
 see also DiGuilio,
 
 491 So.2d at 1138. Here, the State had no physical evidence placing Green at the scene of the crime, and none of the surviving robbery victims identified Green as a participant in the events. The only evidence linking Green to the crimes was the testimony of his codefendants, each of whom had made a sweetheart deal with the State in exchange for their testimony and each of whom had a strong interest in fingering someone else as the shooter. Because the evidence of Green’s guilt was far from conclusive, the error in permitting these comments was not harmless. Accordingly, we reverse and remand for a new trial.
 

 Firearms Evidence
 

 Because we are remanding for a new trial, we also address Green’s argument that the trial court erred by admitting evidence of three firearms that were found in Green’s home two days after the shooting, none of which were tied to the charged offenses in any way. We agree with Green that the admission of this evidence was improper.
 

 The three firearms at issue were found in Green’s home when a search warrant was executed two days after the shooting. Two of the firearms were found in Green’s roommate’s bedroom. The other firearm was found in Green’s bedroom. All three were .380 semiautomatic handguns, and Cameron was shot with a .380 firearm. However, the State’s forensic testing determined that none of the firearms seized from Green’s home fired the fatal shot. Thus, the State was unable to connect any of the three firearms to the charged offenses.
 

 Despite this inability to connect the firearms to the offenses, the State nevertheless offered the firearms into evidence at trial. The State argued that the firearms were relevant to corroborate the codefen-dants’ testimony that Green had firearms at his home and that they went to Green’s house specifically to obtain firearms to use in the burglary. Green argued that even if the evidence of these firearms had some relevance, which Green did not concede, any relevance was significantly outweighed by the danger of unfair prejudice. The trial court overruled Green’s objections and admitted the firearms into evidence.
 

 As to the two firearms found in Green’s roommate’s bedroom, the trial court erred by admitting any evidence of these guns because they were completely irrelevant. Relevant evidence is evidence that tends to prove or disprove a material fact.
 
 See
 
 § 90.401, Fla. Stat. (2007);
 
 see also Zabner v. Howard Johnson’s Inc. of Fla.,
 
 227 So.2d 543, 545 (Fla. 4th DCA 1969) (holding that relevant evidence has “a tendency to establish a fact in controversy or to render a proposition in issue more or less probable”). Here, not only were these two firearms not connected in any way to the charged offenses, they
 
 *738
 
 were also not connected to Green. The fact that Green’s roommate possessed two .380 semiautomatic firearms that were not connected to the charged offenses did not tend to prove or disprove any material fact in controversy and thus had absolutely no relevance whatsoever. Therefore, those firearms should not have been admitted into evidence under any theory.
 

 As to the firearm found in Green’s bedroom, the existence of such a firearm in Green’s bedroom would tend to render the proposition that the codefendants went to his house to get a firearm more probable. Thus, the existence of that firearm was marginally relevant to Green’s participation in the charged crimes.
 

 However, even relevant evidence should be excluded when the relevance is substantially outweighed by the danger of confusion or unfair prejudice.
 
 See
 
 § 90.403. In conducting this weighing process, the trial court should “consider the need for the evidence, the tendency of the evidence to suggest to the jury an improper basis for resolving the matter, the chain of inference necessary to establish the material fact, and the effectiveness of a limiting instruction.”
 
 Denmark v. State,
 
 927 So.2d 1079, 1081-82 (Fla. 2d DCA 2006) (citing
 
 Steverson v. State,
 
 695 So.2d 687, 689 (Fla.1997)). Evidence that requires an extended chain of inferences to be relevant or that suggests an improper basis for the jury’s verdict should be excluded.
 

 For example, in
 
 Blair v. State,
 
 667 So.2d 834, 836 (Fla. 4th DCA 1996), the defendant was charged with burglary of an occupied structure, grand theft, dealing in stolen property, and conspiracy to commit burglary based on a burglary at a residence that was being renovated. During discovery, the State obtained a briefcase that was owned by the defendant and which contained wires, screwdrivers, magnets, and telephone wire endings.
 
 Id.
 
 at 840. The State sought to admit the briefcase and its contents at trial, arguing that the items were “probative based on the inference that [the] defendant probably planned to use the electronic equipment in the burglary[.]”
 
 Id.
 
 However, the State could not establish any nexus between the briefcase and its contents and the actual burglary.
 
 Id.
 

 In finding that the prejudicial effect of this evidence outweighed its probative value, the
 
 Blair
 
 court noted that “[tjhere is nothing unlawful about keeping electronic equipment in a briefcase, and there was no direct connection between the electronic equipment and the crimes with which the defendant was charged. Therefore, the evidence and testimony supported an improper implication that [the] defendant was a career burglar and thus, must have committed these crimes.”
 
 Id.
 

 Here, as in
 
 Blair,
 
 any probative value of the firearm found in Green’s bedroom was outweighed by the danger of unfair prejudice. As with the briefcase in
 
 Blair,
 
 any possible probative value of Green’s legal possession of a firearm that was unconnected to the charged crimes was outweighed by the possibility that the jurors would improperly rely on this evidence to determine that since Green owned this .380 handgun, he must have owned another one that he used to commit the charged crimes. Because such an inference is not properly drawn from the evidence, the admission of the firearm was unduly prejudicial, and any evidence concerning this firearm should be excluded on retrial.
 

 Reversed and remanded for further proceedings.
 

 WALLACE and LaROSE, JJ., Concur.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).