Darius **HARRIS**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

**No. 2011–SC–000001–MR.**

Supreme Court of Kentucky.

Sept. 20, 2012.

As Modified on Denial of Rehearing
Dec. 20, 2012.

Molly Mattingly, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Perry Thomas Ryan, Assistant Attorney General, Office of Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Appellant Darius Harris appeals a judgment of the Kenton Circuit Court sentencing him to forty years in prison for murder. Before this Court as a matter of

right, Ky. Const. § 110(2)(b), Harris raises three errors on appeal. First, Harris claims the trial court erred when it allowed into evidence the fact that he owned two guns, both of which were the same model as the murder weapon, though neither weapon was used to commit the crime. Second, Harris claims the trial court erred when it admitted hearsay testimony, specifically the victim's request to borrow money from his wife. Finally, Harris claims the trial court erred when it refused to allow him to inform the jury he had been tried twice previously for this offense and both prior juries deadlocked. There is no merit to Harris's final claim and, while there is merit to Harris's first two claims, we find the errors are individually and collectively harmless. Accordingly, we affirm the judgment of the Kenton Circuit Court.

### FACTS

On March 19, 2006, at 10:35 p.m., police received a call reporting the death of Haitham Asad at the local convenience store he owned in Covington, Kentucky. Police found a .380 shell casing at the scene of the crime and determined Asad died from a gunshot wound to the head caused by a bullet fired from a .380 caliber gun.

Amanda Bishop testified she was walking towards the convenience store on the night of the murder to buy a soda when she heard raised voices and saw two men, one black and one white, in the store arguing with Asad. Bishop identified the black man, who was tall, had an afro and was wearing a black puffy jacket with fur on the hood, as Harris. She stated she knew Harris from the neighborhood and was certain he was the black man she saw in the store that night, arguing with and pointing a gun at Asad. At one point, Bishop testified, she heard Harris yell at Asad, "You owe me." Bishop was unsure of the other man's identity but suggested it may have been James Eckler, a man who often associated with Harris. (It was later determined, however, that it could not have been Eckler, who was serving time in jail the night of Asad's murder.) Seeing the argument escalate, Bishop turned away to return home, at which point she saw a flash from the corner of her eye and heard a shot. Bishop later told the police she then ran straight home, but she testified at trial that she actually hid behind a nearby retaining wall with her coat over her head to avoid detection. From this position, Bishop claimed she saw the men run from the store, with Harris running across the street towards a residential area and the other man running up into the woods. During cross-examination, Bishop admitted she is agoraphobic, which causes her to become dizzy, disoriented and panicked in public places, and that she was on several medications in March of 2006.

Douglas Cornett, who also knew Harris, testified he saw a gold Pontiac he thought belonged to Harris in the area near the time of the murder, though Cornett never saw the driver of the car. Shortly after seeing the car, Cornett was walking near the convenience store and heard popping noises. Cornett stated he then saw two people running from the store and, though he could only make out their silhouettes, he believed the very tall man with the bushy hair was Harris.[1] Cornett did not report what he saw until he heard Crime Stoppers was offering a reward for information; Cornett was paid $700.00 for his information. On cross-examination, Cornett admitted he often provides the police with information on crimes in exchange for money. He further admitted he was

---

1. Harris is between 6'5" and 6'7" tall.

heavily using drugs in March 2006 and changed his story several times in this case. When asked about the different versions of the story, Cornett acknowledged that he had lied to police in earlier conversations.

Steven Lowe, an inmate of the Kenton County jail, testified Harris confessed to him that he had killed Asad. Lowe claims he was serving food on the ninth floor of the jail when he saw Harris in one of the temporary holding cells near the deputy's station. Lowe said that, though he had not seen Harris in a couple of years, they knew each other from the neighborhood. Lowe claims he asked Harris why he was in jail, to which Harris replied he had accidentally shot a store clerk during a robbery. Lowe told police this conversation took place in September 2008. In exchange for this testimony, the United States Attorney's office agreed to recommend a sentence of less than ten years on federal charges pending against Lowe, which was less than the statutory minimum; Lowe would have otherwise faced a possible life sentence. Harris testified he had never before met or spoken with Lowe. Kim Roberts, a police officer who worked on housing inmates at the Kenton County jail, testified that, contrary to Lowe's testimony, neither Harris nor Lowe was in the Kenton County jail in September 2008, both having been transferred to other facilities much earlier in the year. She testified that both men were housed on the ninth floor in December 2008. Records for the jail showed Harris was regularly housed on the tenth floor of the jail and was only on the ninth floor for one day in 2006 and for one day in 2008. There was no record of Harris ever being in the temporary holding cell near the deputy's station on either of those days, though Roberts testified it was possible Harris could have been placed there briefly during the move without it being noted in the record. At trial, Harris was allowed to cross-examine Lowe and Roberts extensively. He raises no issue on appeal about either witness.

Covington police brought Harris in for questioning on March 23, 2010, four days after the shooting, and contemporaneously obtained and executed a search warrant at his house. Harris cooperated with the police during the interview, including telling them where his .380 handgun was located in the house. The results of the search included the .380 handgun, a clip containing .380 ammunition, and a box of .380 bullets. During his interview with police, Harris changed his story about his whereabouts on March 19 several times. Eventually he claimed he spent the evening of Asad's murder eating dinner with his brother and girlfriend, stopping by a gas station to buy gas and donuts, dropping off his brother at their mother's house and then returning home, where he remained the rest of the night. Harris said he did see the police lights at the convenience store that night but assumed the store had been robbed again. Harris claimed he did not know Asad had been killed until the following day, when he heard the news from a friend. Harris's girlfriend testified she and Harris spent the evening just as Harris indicated, though she did smoke a blunt and fall asleep at some point during the night.

Video surveillance footage from a local Shell station, whose timestamp was accurate within three to five minutes, shows Harris, wearing a dark puffy jacket with a fur-lined hood, at the gas station from approximately 10:09 p.m. to 10:18 p.m. the night of Asad's murder. Harris never volunteered this information to the police but, when confronted with the proof, conceded he did visit the Shell station that night near the time of the murder.

At trial, the jury heard testimony from Bishop, Cornett and Lowe as well as Asad's wife, Tina Asad. She testified about her husband, his convenience store business and that it was not unusual for him to borrow around $300.00 from her when he was having difficulty meeting the rent payment for his store. She also testified that three or four days prior to the shooting he asked to borrow $800.00, but he did not say why he needed the money.

Harris testified in his defense and denied any involvement in the murder of Asad. He claimed he often frequented the convenience store, considered Asad a friend and was saddened to hear of his death. Harris reiterated that he spent the evening having dinner and buying gas and donuts with his brother and girlfriend, driving his brother home and then returning home with his girlfriend, where he played video games the rest of the night. Harris admitted he went to the Shell station to visit with friends and buy cigarettes but claimed he went directly home after he left the gas station.

There were no prints on the .380 handgun found in Harris's home. The police located another .380 handgun, which belonged to Harris, in the Cincinnati Police Department property room. According to Harris, he legally purchased both guns several years earlier and gave this second gun to his then-fiancee. Both guns were tested and it was determined that neither of the .380 guns was the murder weapon. Additionally, Harris's prints were not among those lifted from the scene, but there was gunshot residue on the sleeve of Harris's dark puffy jacket with a fur-lined hood, which he wore to the interview with police.

In Harris's first two trials the juries deadlocked, and Harris was tried for a third time on November 2—4, 2010. This third jury found Harris guilty of murder, and in accordance with the jury's recommendation, the trial judge sentenced him to forty years in prison. On appeal, Harris raises the previously noted claims of error. We begin with his first claim, that the trial court erred by admitting the two .380 handguns Harris owned, which were similar to the murder weapon but were not used to commit the crime.

### ANALYSIS

This Court reviews allegedly erroneous evidentiary rulings for abuse of discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). The test for an abuse of discretion "is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* Absent such abuse, this Court will not disturb a trial court's decision to admit evidence. *Anderson v. Commonwealth*, 231 S.W.3d 117 (Ky.2007). If the trial court errs, this Court may still determine that the error is harmless pursuant to RCr 9.24 and the standards set forth in *Winstead v. Commonwealth*, 283 S.W.3d 678 (Ky.2009).

### I. Guns That Were Not Used in the Crime Were Not Admissible But the Error Was Harmless.

The trial court admitted the two .380 handguns owned by Harris on the grounds that they tended to show Harris preferred and was familiar with this type of weapon. Testing showed and it was stipulated at trial that neither weapon was used in the murder of Asad. Harris objected in the trial court to the admission of these guns, claiming they were irrelevant and prejudicial, a position he maintains on appeal. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evi-

dence." Kentucky Rule of Evidence (KRE) 401. Evidence that is not relevant is not admissible. KRE 402. Evidence that is relevant may still be excluded where the danger of undue prejudice substantially outweighs its probative value. KRE 403.

■ Weapons may be admitted where there is a possible connection to the crime but that connection is not definitively established. In *Sweatt v. Commonwealth*, 550 S.W.2d 520 (Ky.1977), the Court admitted a gun found in the defendant's bedroom that matched the victim's description of the gun used in the crime, though the gun could not definitely be identified as the weapon used in the crime. In *Barth v. Commonwealth*, 80 S.W.3d 390 (Ky.2001), the Court admitted wooden window slats whose size and shape matched marks on the victim's body, though the victim was blindfolded during the attack and could not identify the weapons used. And in *Grundy v. Commonwealth*, 25 S.W.3d 76 (Ky. 2000), the Court admitted a piece of concrete the victims claimed to have found near the scene of the crime, though it could not be conclusively ascertained the concrete was used in the crime. In all of these cases, it was possible the weapon was used in the crime and there was sufficient identification and nexus to justify admitting the weapon.

■ Weapons that are known to have no connection to the crime, however, are generally not admissible. *Major v. Commonwealth*, 177 S.W.3d 700 (Ky.2005). In *Major*, the defendant killed his wife with a pistol but the pistol was never recovered. The trial court permitted the Commonwealth to introduce a handgun, a shotgun and a rifle that were owned by the defendant but were not used in the crime. This Court reversed, holding the guns were not admissible "absent evidence that any of the firearms were involved in the murder."

*Id.* at 710. Courts in other jurisdictions have also held that weapons not involved in the crime are inadmissible. Similar to this case, in *Commonwealth v. Marshall*, 743 A.2d 489 (Pa.Super.Ct.1999), the Pennsylvania Superior Court held the defendant's nine millimeter handgun, which was the same caliber as the murder weapon, was not admissible because it was not used in the commission of the crime. The court explained that in cases where it is shown the weapon was not used in the crime, the weapon is irrelevant and, consequently, inadmissible. *Id.* at 492. The *Marshall* court noted, "the only purpose that was served by the admission of the handgun was to prejudice appellant." *Id.* at 494. The California Supreme Court has also held that weapons not used in the commission of the crime are not admissible, even where the weapon is of the same make or model as that used in the crime. *People v. Riser*, 47 Cal.2d 566, 305 P.2d 1 (1956) *overruled inpart on other grounds by People v. Morse*, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 (1964). In *Riser*, the victims were killed with a .38 revolver, which was never recovered, and the state sought to introduce two .38 caliber guns recovered from the defendant. *Id.* The California Supreme Court held the guns were inadmissible because it was determined the bullets found at the scene could not have come from those guns. *Id.* at 577, 305 P.2d 1. The *Riser* Court explained it would be error to admit such evidence because it "tends to show, not that [the defendant] committed the crime, but only that he is the sort of person who carries deadly weapons," which is not valid grounds for admission. *Id.* Similarly, in *Green v. State*, 27 So.3d 731 (Fla.Dist.Ct. App.2010), the victim was shot with a .380 caliber handgun and the police recovered three .380 caliber handguns from the defendant's home. *Id.* Because forensic test-

ing showed that none of the guns was the murder weapon, the Court held the guns were inadmissible. *Id.*

Unlike *Sweatt, Barth* and *Grundy,* this is not a case where the gun simply cannot be identified positively as the murder weapon. In this case, it is not possible that either of Harris's .380 handguns was used in the crime. There is no evidence connecting either gun to the crime scene and forensic testing definitively established neither gun was used to kill Asad. Thus, this case falls directly in line with *Major, Marshall, Riser* and *Green,* which make clear that weapons which are not used in the commission of the crime are not admissible. As it is undisputed that the .380 guns owned by Harris were not used to kill Asad, the guns were irrelevant and should not have been admitted at trial.

The Commonwealth insists that introduction of the guns was appropriate to show Harris's "preference for, comfort with, and access to" this particular type of weapon. This argument is not further developed but to the extent it is suggested this is evidence of Harris's habit *i.e.,* his usual choice of weapon was a .380 gun, we reject its application on these facts. Habit evidence was historically rejected by Kentucky courts. *Burchett v. Commonwealth,* 98 S.W.3d 492, 495 (Ky.2003) (quoting *Louisville & N.R. Co. v. Taylor's Adm'r,* 31 Ky.L.Rptr. 1142, 104 S.W. 776 (1907)) ("[N]either side can give in evidence what the custom or practice of either of the parties is. The question is not what they were accustomed to do, but what they did at the time in controversy."). However, a relatively new rule, KRE 406, effective July 1, 2006, now allows habit evidence: "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." In adopting the rule, this Court included the following commentary from the corresponding federal rule:

Character and habit are close akin. Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness. 'Habit,' in modern usage, both lay and psychological, is more specific. It describes one's regular response to a repeated specific situation. If we speak of character for care, we think of the person's tendency to act prudently in all the varying situations of life, in business, family life, in handling automobiles and in walking across the street. A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semiautomatic.

Habit is thus focused on one's regular conduct. It seems clear that even if that could be understood to encompass having something regularly in one's possession (*e.g.,* He always carries a handkerchief when he leaves home) it would not extend to this situation. Harris had one .380 gun in his home and owned another that had been confiscated by the Cincinnati Police. This was evidence of ownership and nothing more, certainly not a personal habit that was relevant to proving his conduct on a particular occasion.

 While the trial court erred in admitting the .380 handguns, the Commonwealth maintains that the error was harmless and, as such, does not require re-

versal. RCr 9.24. A non-constitutional evidentiary error such as this one is harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. *Winstead v. Commonwealth*, 283 S.W.3d at 678. While the guns should not have been admitted, it was repeatedly made clear to the jury that the guns were not the murder weapons. Both the prosecutor and the defense attorney reiterated this fact throughout the trial and independent witnesses testified as to the forensic testing done on the bullets and guns, which proved the guns were not used in the crime. There was also testimony to the effect that a .380 handgun is not a unique or signature weapon; that a .380 gun is relatively easy to obtain and that this particular type of gun is commonly used. We can say with fair assurance that this erroneously admitted evidence did not substantially sway the verdict and note, additionally, the evidence which the jury heard in reaching their verdict. Amanda Bishop was an eyewitness to the crime and claimed consistently and definitely that she saw Harris, whom she knew from the neighborhood, in the store, arguing with and pointing a gun at Asad right before she saw a flash and heard a gunshot. Bishop, a clearly reluctant witness, testified graphically that when she ran into Harris a few days after the murder and he came up to speak with her, knowing what she had seen, she "didn't know whether to puke or piss myself." Bishop's description of Harris and his clothing matched the image of him on the Shell station surveillance video, and her claim of having seen the two men running from the store was consistent with what Doug Cornett, who also knew Harris, saw shortly after he heard shots near the store. In addition to Bishop's testimony, Cornett's testimony and the Shell surveillance video put Harris in the vicinity of the store near the time of the murder. The Commonwealth also presented Steven Lowe's testimony that Harris confessed to robbing and murdering Asad and while Lowe's testimony was assailable on several grounds, Harris was allowed to pursue those grounds though extensive cross-examination. The jury had ample opportunity to hear from and evaluate these witnesses and Harris himself, who testified in his defense. In sum, we conclude the judgment was not substantially swayed by the admission of the handguns, and the error is therefore harmless.

## II. The Testimony Regarding the Victim's Request to Borrow Money Was Hearsay and Inadmissible But Harmless in the Context of the Case.

The trial court permitted Asad's wife to testify that, shortly before Asad was killed, he asked her if he could borrow $800.00. The defense objected that such testimony was impermissible hearsay, but the trial court ruled it was admissible under KRE 803(3) as evidence of Asad's then-existing state of mind, namely Asad's indebtedness to and fear of Harris. We conclude that the question Asad asked contained an implied assertion and therefore was hearsay, but it was not admissible under the state of mind or any other hearsay exception. The admission of Asad's question to his wife was therefore error, but ultimately the error was harmless.

 Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. KRE 801(c). Thus, not all out-of-court utterances are hearsay. Only those that qualify as "statements" and that are offered to prove the truth of the matter asserted can be considered hearsay. A "statement" is defined as (1) an oral or written assertion or (2) nonverbal conduct of a person, if the conduct is

intended by the person to be an assertion. KRE 801(a). The term "assertion" is unfortunately not defined by the rules, and the many courts that have considered the issue have come up with an equally varying number of definitions.[2] Reviewing and consolidating the myriad definitions offered by these cases as well as by several different dictionaries, we conclude an "assertion" is a statement or expression of a fact, condition or opinion.

The out-of-court utterance at issue in this case is a question: Asad's query to his wife as to whether he could borrow $800.00. The parties never addressed the threshold issue of whether this question contained an assertion and was thus a statement under KRE 801(a). Whether a question can be an assertion and, thereby, hearsay has been extensively discussed by numerous courts and commentators, though no consensus has been reached. The courts that have considered the issue have reached one of three conclusions: (1) a question can be hearsay if it contains an assertion; (2) a question can be hearsay if the declarant intended to make an assertion; or (3) questions can never be hearsay because they are inherently non-assertive.

Unlike courts which subscribe to the third conclusion, courts which reach the first and second conclusions recognize that while many questions simply seek information and are indeed non-assertive, questions can contain assertions, both explicit and implied. For example, "What are the store's hours of operation?" does not contain an assertion and merely seeks information as to when the store is open. The question, "Does Mike still have the drugs I gave him yesterday?" however contains the explicit assertion that the declarant gave Mike drugs yesterday. And the question, "Do you need change?" contains the implied assertion that the declarant has change. *Brown v. Commonwealth*, 487 S.E.2d at 251. Whether or not implied assertions can constitute hearsay was once widely debated; while a few courts still maintain implied assertions can never be hearsay, *e.g., Lewis*, 902 F.2d at 1179, the vast majority of courts now hold implied assertions can be hearsay, *e.g., Kutz*, 671 N.W.2d at 678. We agree.

Courts in the first category, which find questions can be hearsay if they contain an assertion, determine whether a question contains an assertion by examining the content of the question and the circumstances surrounding its utterance. *See e.g., United States v. Wright*, 343 F.3d 849, 866 (6th Cir.2003) ("Where is your husband?" is not assertive); *Ex parte Hunt*, 744 So.2d at 857 ("Who signs the payroll checks?" is not assertive); *Powell v. State*, 714 N.E.2d 624 (Ind.1999) ("What, you think we ain't got guns, too?" impliedly asserts the men had guns); *Brown*, 487 S.E.2d at 252 ("Does Peggy know I am here?" implies that the speaker knows Peggy); *State v. Rawlings*, 402 N.W.2d 406, 408–409 (Iowa 1987) ("Dennis, what are you doing?" as testified to by witness

---

**2.** *See e.g., United States v. Summers*, 414 F.3d 1287, 1299 (10th Cir.2005) (defining assertion as "to state or declare positively and often forcefully or aggressively" or "to demonstrate the existence of"); *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir.1990) ("A positive declaration."); *United States v. Zenni*, 492 F.Supp. 464, 468 (E.D.Ky.1980) ("A forceful or positive declaration."); *State v. Kutz*, 267 Wis.2d 531, 671 N.W.2d 660, 675 (App.2003) ("An expression of a fact, condition, or opin- ion."); *Ex parte Hunt*, 744 So.2d 851, 857 (Ala.1999) ("State or imply the existence of any facts."); *Brown v. Commonwealth*, 25 Va. App. 171, 487 S.E.2d 248, 251 (1997) ("Assert the truth or falsity of a fact."); *Kolb v. State*, 930 P.2d 1238, 1246 (Wyo.1996) ("To say that something is so, *e.g.,* that an event happened or that a condition existed."); *State v. Land*, 34 S.W.3d 516, 525 (Tenn.Crim.App.2000) ("To state as true; declare; maintain.").

to assault implicitly asserts that Dennis was present during the crime); *Kolb,* 930 P.2d at 1246 ("Are you John?" is not assertive); *Carlton v. State,* 111 Md.App. 436, 681 A.2d 1181 (Md.Ct.Spec.App.1996); *State v. Saunders,* 23 Ohio App.3d 69, 491 N.E.2d 313, 316 (1984). The majority of the courts that utilize this analysis are state courts.

Courts in the second category take a different approach, focusing not on the content of the question, but on the declarant's intent. These courts base their analysis on the Advisory Committee's Note to the similar Federal Rule of Evidence (FRE) 801(a), which states, "[T]he effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. The key to the definition is that nothing is an assertion unless intended to be one." The Advisory Committee reasoned that where the declarant does not intend the utterance to be an assertion, his or her sincerity is not in question and the need for cross-examination to test perception, memory, and narration is much diminished. Federal Advisory Committee Note on FRE 801(a). Thus, regardless of the content of the question or its effect on the listener, if the declarant did not intend to make an assertion when asking the question, courts employing this analysis hold the question cannot be hearsay. *E.g., United States v. Long,* 905 F.2d 1572 (D.C.Cir.1990) (holding caller's questions, "Can I speak with Keith? Does he still have any stuff? Does he have a fifty?" not hearsay because caller was seeking information and did not intend to make an assertion); *Lewis,* 902 F.2d at 1179 (holding "Did you get the stuff? Where is Dog?" not hearsay because declarant seeking answers, not intending to make an assertion). *Summers,* 414 F.3d at 1300 (question to police "How did you guys find us so fast?" was asser-

tion that "intimated both guilt and wonderment at the ability of the police to apprehend the perpetrators . . . so quickly"); *See also United States v. Jackson,* 88 F.3d 845, 848 (10th Cir.1996). The majority of the courts that utilize this analysis are federal courts.

Courts in the third category impose a blanket rule that precludes any out-of-court question from being hearsay on the grounds that inquiries are inherently non-assertive. *United States v. Oguns,* 921 F.2d 442, 449 (2d Cir.1990) ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement."); *State v. Carter,* 72 Ohio St.3d 545, 651 N.E.2d 965, 971 (1995) ("Because a true question or inquiry is by its nature incapable of being proved either true or false and cannot be offered 'to prove the truth of the matter asserted,' it does not constitute hearsay."); *State v. Collins,* 76 Wash.App. 496, 886 P.2d 243, 244 (1995) ("Because an inquiry is not assertive, it is not a 'statement' . . . and cannot be hearsay.").

We decline to follow the courts in this last category because we can see no logical reason why the grammatical form of an utterance—whether a declarative sentence, a command or a question—should conclusively determine whether the utterance is an assertion. *Kutz,* 671 N.W.2d at 677. "One cannot avoid the hearsay rule by tacking a question mark at the end of an essentially factual statement." *KW Plastics v. U.S. Can Co.,* 130 F.Supp.2d 1297, 1299 (M.D.Ala.2001). Nor do we adopt the approach of those courts that focus on the declarant's intent. This approach is derived entirely from the Federal Advisory Committee's Note to FRE 801(a), and while we may agree with federal precedent where situations are sufficiently similar, in this instance we find the reasoning of the federal courts to

be unpersuasive. The logic behind this approach—that the dangers against which the hearsay rule protects are diminished when the declarant does not intend to make an assertion—has been cast in doubt by other courts and commentators. "The declarant's lack of intent to communicate the implied proposition does not increase the reliability of the declarant's words in a degree sufficient to justify exemption from the hearsay rule." *Stoddard v. State*, 389 Md. 681, 887 A.2d 564, 577 (2005).[3] *See also State v. Dullard*, 668 N.W.2d 585, 594 (Iowa 2003) ("We are not convinced that the absence of intent necessarily makes the underlying belief more reliable, especially when the belief is derived from verbal conduct as opposed to nonverbal conduct."); Paul R. Rice, *Symposium: Federal Privileges In The 21st Century: Back to the Future with Privileges Abandon Codification, Not the Common Law*, 38 Loy. L.A. L.Rev. 739, 764–65 (2004) ("This distinction [between unintended and intended assertions] is illogical to the point of being absurd."); Paul R. Rice, *Should Unintended Implications of Speech be Considered Nonhearsay? The Assertive/Nonassertive Distinction Under Rule 801(a) of the Federal Rules of Evidence*, 65 Temp. L.Rev. 529, 531 (1992); Ronald J. Bacigal, *Implied Hearsay: Defusing the Battle Line Between Pragmatism and Theory*, 11 S. Ill. U. L.J. 1127, 1132 (1987) ("[U]nintentional implied assertions have an inherently greater potential to be more ambiguous than intended assertions. The Federal Rules have it backward by classifying the less ambiguous intended assertions as hearsay, while classifying the more ambiguous unintentional assertions as nonhearsay."). We agree with these critics that the dangers protected against by the hearsay rule are as considerable with unintended assertions as with intended assertions. Also, focusing on the declarant's intent places courts in the unfortunate position of having to speculate as to what a declarant intended when asking a particular question. The more sound approach, we find, is that taken by courts in the first category: whether a question contains an assertion, and thereby is a statement that could be subject to the hearsay rule, depends on the content of the question and the circumstances surrounding its utterance. Generally a party does not offer evidence unless it will advance the offeror's case so trial courts should scrutinize the testimony to determine if it contains an assertion.

■ In this case, Asad asked his wife if he could borrow $800.00. This question contains the implied assertion that Asad needed $800.00. The Commonwealth actually offered the testimony to prove Asad needed $800.00. As an implied assertion offered to prove the truth of the matter implicitly asserted, the question was hearsay and should have been excluded absent an applicable exception.

■ The Commonwealth contends the testimony was admissible under the KRE 803(3) exception as evidence of Asad's then-existing state of mind, *i.e.*, that he was in need of money that he did not have. While the statement may have reflected Asad's state of mind near the time of his murder, statements that can be understood as reflecting the basis for a victim's fear of a defendant are not admissible where the victim's state of mind is not at issue. *Bray v. Commonwealth*, 68 S.W.3d 375 (Ky.2002); *Partin v. Commonwealth*, 918 S.W.2d 219 (Ky.1996), *overruled on other grounds by Chestnut v.*

---

**3.** *Stoddard* contains an exhaustive discussion of intended and unintended assertions, particularly as included in a question. It considers the theoretical underpinnings of the hearsay rule and the above-cited articles in rejecting the federal approach.

*Commonwealth,* 250 S.W.3d 288 (Ky.2008). Except where a defendant claims self-defense, an accidental death or suicide, such statements usually have little relevancy. *Bray,* 68 S.W.3d at 381–82; *Partin,* 918 S.W.2d at 222. The principal danger with admitting such statements is that the jury will consider the victim's statement of fear as "a true indication of defendant's intentions, actions, or culpability. Such inferences are highly improper and where there is a strong likelihood that they will be drawn by the jury the danger of injurious prejudice is particularly evident." *United States v. Brown,* 490 F.2d 758, 766 (D.C.Cir.1973), *cited with approval in Partin,* 918 S.W.2d at 222.

In *Ernst v. Commonwealth,* 160 S.W.3d 744 (Ky.2005), this Court held several statements by different witnesses regarding the victim's state of mind were relevant where the defendant claimed both self-defense and that the victim's death was accidental. *Id.* at 753. The witnesses in *Ernst* testified that, prior to the victim's death, she was hesitant to rent defendant a room, planned to have the defendant evicted, was worried about paying excessive phone charges the defendant had accrued and felt sorry for defendant but was worried about handling the situation with him. *Id.* at 752–53. The *Ernst* Court noted the rule that statements concerning a victim's state of mind are "inadmissible unless the victim's state of mind is relevant," and held the statements therein were relevant because the defendant claimed both that he acted in self-defense and that the victim's death was an accident. *Id.* By way of comparison, in *Bray,* 68 S.W.3d at 375, the Court held inadmissible the victim's statement regarding her fear of the defendant because the victim's state of mind was not an issue in the case. Noting that such statements have little relevancy except where the defendant claims self-defense, suicide or accident, the *Bray* Court

held the victim's statements were inadmissible because "her state of mind was not at issue in the case, nor did Appellant invoke any defense that might make her statements relevant." *Id.* at 382. *See also Blair v. Commonwealth,* 144 S.W.3d 801 (Ky.2004).

The trial court herein abused its discretion when it admitted Asad's hearsay statements because Asad's state of mind was not at issue in this case. Unlike the defendant in *Ernst,* Harris did not raise any of the defenses that would make testimony revealing Asad's state of mind relevant. Harris's defense was that he did not have anything to do with Asad's murder. He never claimed self-defense, that Asad's death was a suicide or that it was an accident. The statements were thus irrelevant and should not have been admitted.

 While it was error to admit the statement, the testimony did not substantially sway the judgment and the error was therefore harmless. *Winstead,* 283 S.W.3d at 688–89. The most the jury could have taken away from the testimony was that Asad needed $800.00. There was no assertion as to what Asad needed the money for, *e.g.,* rent, store expenses, debt repayment or a purchase. In addition, as noted above, there was more than sufficient other evidence introduced by the Commonwealth to convict Harris in Asad's murder. The admission of the testimony regarding Asad's request to borrow money was therefore harmless. Our conclusion is the same even when this hearsay evidence is considered in conjunction with the inadmissible gun evidence. While both rulings were in error, the probative value of the improperly admitted evidence was so limited, even in conjunction, that it is not likely to have "substantially swayed the judgment," and so the errors were harmless. *Id.*

### III. Evidence That Two Prior Juries Had Deadlocked Was Properly Excluded.

 The trial court properly refused to allow the defense to tell the jury Harris had already been tried twice on these charges and the prior two juries deadlocked. As noted above, evidence that is irrelevant is inadmissible. KRE 402. The fact that Harris was tried twice before on the same charge and the jury "hung" does not make the existence of any fact of consequence any more or less probable. KRE 401. In fact, it has nothing to do with whether or not Harris murdered Asad. There is no probative value to such information, which would serve only to confuse the jury. Writing in the double jeopardy context in *Yeager v. United States,* 557 U.S. 110, 120, 129 S.Ct. 2360, 174 L.Ed.2d 78 (2009), the United States Supreme Court described a so-called "hung jury" as a "non-event." In that case the jury acquitted the defendant on some counts and was unable to reach a verdict on other counts. As to the latter counts which did not result in a verdict, the Court stated:

> there is no way to decipher what a hung count represents. Even in the usual sense of "relevance," a hung count hardly "make[s] the existence of any fact ... more probable or less probable." A host of reasons—sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few— could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork.

*Id.* at 121–22, 129 S.Ct. 2360. Because the two prior deadlocked juries were not relevant, the trial court correctly excluded the information. As to any necessary reference to testimony in those trials, the trial court properly ruled that any necessary reference to Harris's former trials should be described using such terms as "prior testimony" or "prior hearing."

### IV. Points of Error Which Cite Constitutional Provisions Without Explanation Will Not Be Addressed.

 Finally, we note that in addition to the alleged violations of the Rules of Evidence, Harris claims that each identified error violated his rights under the 6th and 14th Amendments of the United States Constitution and sections 2 and 11 of the Kentucky Constitution. We decline to address these arguments for failure to comply with our Rules of Civil Procedure (CR), which require Appellant's brief to contain "[a]n 'ARGUMENT' conforming to the Statement of Points and Authorities, with ample supportive references to the record and citations of authority pertinent to each issue of law....". CR 76.12(4)(c)(v). Harris's brief does not simply lack ample supportive references and citations of pertinent authority for these constitutional claims; rather, it generally lacks any references or authority whatsoever, providing only a single reference to *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), for the general principle that a criminal defendant has a fundamental right to present a defense.[4] lacks any references or authority

4. In *Chambers,* the Mississippi hearsay and "voucher" rules prevented the defendant from confronting and cross-examining a witness who had thrice confessed to the murder for which the defendant was being tried. In this context, the United States Supreme Court reiterated the unassailable principle that an accused has the fundamental right "to present witnesses in his own defense" 410 U.S. at 302, 93 S.Ct. 1038, 35 L.Ed.2d 297. *Chambers* has no apparent connection to Harris's novel argument that he should have been

whatsoever. Harris completely fails to provide any analysis, any arguments or any legal authority for why the trial court's alleged errors violate his state and federal constitutional rights. Instead, he simply makes a broad statement of error, and then leaves to this Court the task of determining, researching and making his arguments for him. That is not the function or responsibility of this Court. *See Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir.1996) (discussing the similar federal rule and noting it is not the function of an appellate court "to research and construct the legal arguments open to parties, especially when they are represented by counsel."). Appellants who desire review by this Court must ensure their briefs comply with our Rules of Civil Procedure. For those reasons, Harris's alleged constitutional arguments will not be addressed.

### CONCLUSION

The trial court abused its discretion when it allowed the Commonwealth to introduce the fact that Harris owned two guns that were the same caliber as the murder weapon when it was shown that neither gun was used in the commission of the crime. The trial court also erred when it admitted, pursuant to KRE 803(3), testimony that the victim had asked to borrow money from his wife. This was a hearsay statement made by the victim and even if reflective of the victim's state of mind, was not admissible because his state of mind was not an issue in the case. However, these errors were harmless non-constitutional errors and do not warrant reversal. Finally, the trial court's ruling that the defense could not inform the jury that

Harris had been tried twice previously and that both juries had deadlocked was proper. The judgment of the Kenton Circuit Court is affirmed.

All sitting. All concur.

allowed to inform the jury that two prior juries deadlocked on the charges against him and appellate counsel has made no attempt to articulate an analysis that renders *Chambers* "pertinent" to this issue. CR 76.12(4)(c)(v).

Citing *Chambers* for the proposition that an accused is entitled to present a defense is simply not sufficient to comply with CR 76.12. Some explanation is mandatory and none was given here.