COUNCIL ON DEVELOPMENTAL DISABILITIES, INC.,
Appellant,

v.

CABINET FOR HEALTH AND FAMILY SERVICES,
Appellee.

2013–SC–000357–DG

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 24, 2015

As Modified on Denial of Rehearing December 17, 2015

Counsel for Appellant: David B. Tachau, Tachau Meek PLC, 3600 National City Tower, 101 South Fifth Street, Louisville, Kentucky 40202–3120.

Counsel for Appellee: Christina Heavrin, General Counsel, David Brent Irvin, Deputy General Counsel, Jon Robert Klein, Cabinet for Health and Family Services, Office of Legal Services, 275 East Main Street, 5W–B, Frankfort, Kentucky 40621.

## OPINION OF THE COURT BY JUSTICE NOBLE

When a disabled adult under the state's care is alleged to have been abused or to have died from abuse, the Cabinet for Health and Family Services investigates and produces confidential records related to the investigation. Though otherwise confidential, those records may be disclosed to certain individuals and groups under KRS 209.140, including "social service agencies ... that have a legitimate interest in the case." KRS 209.140(3). Does this confidentiality exemption extend to a private non-profit corporation that advocates generally for "children and adults with mental retardation and their families and other interested persons in the community"? We conclude that it does not, and thus affirm.

## I. Background

The Appellant, the Council on Developmental Disabilities, Inc., is a Kentucky nonprofit corporation that advocates for "children and adults with mental retardation and their families and other interested persons in the community." It receives funding from several sources, including Metro United Way and the Louisville/Jefferson County Metro Government.

In January 2010, the Council learned of the death of Richard Tardy, a mentally disabled man who had been in the Cabinet's care. For the majority of 2009, Tardy resided in Central State Hospital in Louisville, Kentucky. In late 2009, Tardy was transferred to a group home located in Somerset, Kentucky. That home was operated under Supports for Community Living ("SCL"), a Kentucky Medicaid program providing an alternative to institutional care for individuals with intellectual and developmental disabilities. *See* 907 KAR 1:145.

Tardy died approximately three months after being transferred to the group home. After his death, accusations were made that facility caretakers were abusing residents. On January 27, 2010, April DuVal, then the Council's acting Executive Director, filed a request with the Cabinet under the Kentucky Open Records Act, KRS 61.870–.884, seeking information about Tardy's death. The Council's open-records request demanded documents relating to "all investigative and follow-up activities completed on behalf of Richard Tardy." On February 9, 2010, the Cabinet denied the Council's request on the grounds that the records were confidential under KRS 209.140 and that the Council did not qualify as an organization exempt from the confidentiality restrictions in that statute.

The Council appealed the Cabinet's decision to the Attorney General as allowed by KRS 61.880(2). The Council argued that it was not statutorily barred from obtaining the records because it qualified as a social service agency with a legitimate interest in the records under KRS 209.140(3). The Attorney General disagreed and found that the Council did not have a legitimate inter-

est in the records because it did "not provide services directly to Mr. Tardy or advocate specifically on his behalf while he was living, and ... does not otherwise have a 'legitimate interest in the case' based upon the agency's reasonable interpretation of this language." *In re The Council on Developmental Disabilities, Inc./Cabinet for Health and Family Services,* Ky. Op. Atty. Gen. 10–ORD–080, at 9 (April 21, 2010).

The Council did not appeal the Attorney General's decision. Instead, it filed a second open-records request on July 28, 2010. This request sought documents relating to the death of Gary Farris. Like Tardy, Farris was a ward of the Commonwealth and was transferred from an institution to a community residence shortly before his death. The Council's open-records request specified its desire to receive "copies of all investigations, coroner's report(s), and Mortality Review Committee findings." The request also included a general demand for any documents relating to the "deaths of any other individuals who were transferred by the Cabinet ... from [state-run institutional] placements and died in community placements after January 1, 2008." The Cabinet denied the Council's request, relying on the same reasoning for its first denial.

This time, instead of seeking review from the Attorney General, the Council filed suit in Franklin Circuit Court under KRS 61.882.[1] The Council sought an order requiring the Cabinet to disclose the requested records.

The trial court denied the Council's request. The court stated that the Council was "most likely not a 'social service agency' as contemplated by the statute," but ultimately avoided resolving that issue.

Instead, the trial court's denial was based on its finding that the Council had failed to demonstrate that it had a legitimate interest in the records sought.

The Court of Appeals, in a divided panel, affirmed the trial court. The majority agreed that the Cabinet was not obligated to disclose the records. One member of the majority agreed with the trial court that the Council did not have a legitimate interest in the case, and thus did not fall under the exception laid out in KRS 209.140. Another member of the majority concluded that *social services agency,* as used in the statute, means only a governmental agency, and thus excluded the Council. The third member of the panel dissented, claiming the Council met the exception.

This Court granted discretionary review.

## II. Analysis

The Kentucky Open Records Act generally allows "free and open examination of public records." KRS 61.871. It also exempts some records from disclosure. *See* KRS 61.878(1) ("The following public records are excluded from the application of KRS 61.870 to 61.884...."). One of the exemptions, the one at issue in this case, is for "[p]ublic records or information the disclosure of which is prohibited or restricted or otherwise made confidential by enactment of the General Assembly." KRS 61.878(1)(*l*). This catch-all provision refers to instances where the General Assembly has designated records as confidential, and thus exempt from disclosure, in a statute other than the Open Records Act.

The General Assembly has done this in KRS 209.140, which begins by saying that

---

1. "A person alleging a violation of the provisions of KRS 61.870 to 61.884 shall not have to exhaust his remedies under KRS 61.880 before filing suit in a Circuit Court." KRS 61.882(2).

"[a]ll information" obtained by the Cabinet for Health and Family Services in an investigation under Chapter 209 "shall not be divulged to anyone." The statute then lists the exceptions for who may receive the information. The exceptions include "[p]ersons suspected of abuse or neglect or exploitation," KRS 209.140(1), "[p]ersons within the department or cabinet with a legitimate interest or responsibility related to the case," KRS 209.140(2), and "[o]ther medical, psychological, or social service agencies, or law enforcement agencies that have a legitimate interest in the case," KRS 209.140(3).

As noted above, the question in this case is whether the Council fits under the social-services-agency exception to the confidentiality of the Cabinet's investigative records. This is a pure question of law, and thus our review is de novo. *See Lawson v. Office of Atty. Gen.*, 415 S.W.3d 59, 65 n. 5 (Ky.2013) ("Our review is plenary of issues concerning the construction or application of the Act.... [O]ur review ... is de novo.").

The Council, of course, apparently claims that it does fall under the exception,[2] having noted in its open-records request that it "monitor[s] the Commonwealth's discharge of its statutory duties to vulnerable and dependent adults with intellectual disabilities, and ... tr[ies] to

identify, address and publicize any problems in the Cabinet's performance of those duties." In essence, the Council claims that it provides social services, and that it had an interest in these particular cases, as part of its general interest in advocating on behalf of dependent adults and in providing social services to that population as a whole.

The argument in opposition to this claim is that it would so extend the social-services-agency exception as to render confidentiality meaningless. First, this would allow "social services" to include any activity aimed at helping people, in this case, dependent adults. Second, this would read "legitimate interest in the case" to include indirect interests, here in the general *subject* of the death of dependent adults. In essence, the Council's interpretation of KRS 209.140(3) would extend the exception to include any watchdog group that has a general interest in subjects investigated by the Cabinet under KRS Chapter 209. Arguably, this reading is so broad as to swallow the stated intent of KRS 209.140, which begins by saying that the information obtained during the Cabinet's investigation under this chapter *"shall not be divulged to anyone."* (Emphasis added.)

### A. Legislative Intent

by the Act itself, *see* KRS 61.871 (stating that exceptions to the Act "shall be strictly construed, even though such examination may cause inconvenience or embarrassment to public officials or others"). As such, the Council has done little to further assist this Court. We remind the bar that "the task of determining, researching and making ... arguments for [an appellant] ... is not the function or responsibility of this Court," *Harris v. Commonwealth*, 384 S.W.3d 117, 130 (Ky.2012), and "[a]ppellants who desire review by this Court must ensure their briefs comply with our Rules of Civil Procedure," *id.*

**2.** Rather than making a substantial argument of its own in its brief, the Council instead references the dissenting opinion in the Court of Appeals. The Council states that it "cannot offer any analysis matching the thorough and closely-reasoned discussion by the dissenting judge ... in the decision below," and asks this court for "leave to adopt that opinion as if incorporated here, with only a few additional comments." The "additional comments" consist largely of complaints that the trial court and Court of Appeals have "erected new barriers ... to public oversight of government officials," and failed to strictly construe the exceptions to general policy favoring disclosure in the Open Records Act as is required

By declaring that the information at issue is confidential and limiting its accessibility, the General Assembly has made clear that it is intended only for the people and the agencies and providers that are actually involved with that adult in providing services or dealing with related criminal prosecutions. Because the meaning of the term "social service agency" is established by statutory context, a dictionary definition alone is not sufficient to give legal definition to the term. And the Council's reading of that term does not take into account why the term was used in the first place, and disregards the legislature's clear intention in enacting a confidentiality provision at all.

We begin by noting that the confidentiality provision and its exceptions are meaningful only in context of Chapter 209, which must be reviewed in its entirety.

Under the Kentucky Adult Protection Act, KRS 209.080–.990, adults of the Commonwealth who are unable to manage their own affairs, or who are unable to protect themselves from abuse, neglect, or exploitation, are able to access a system of protective services to provide assistance in these areas. The Act imposes a duty on all Kentuckians to report suspected abuse, neglect, or exploitation to the Cabinet, even when the adult dies. KRS 209.030(2). Upon receiving such a report, the Cabinet is required to investigate. KRS 209.030(5). In undertaking an investigation, the Cabinet is required, at least, to interview the adult, to assess his or her risk and safety factors, and to identify a potential perpetrator (if possible). KRS 209.020(10). And, through the Office of Inspector General, the Cabinet is to identify any failure of a regulated or licensed facility to adopt or enforce policies which led to abuse, neglect or exploitation of an adult. *Id.* When abuse or neglect is alleged to have caused the death of a dependent adult, the investigation shall include examining a coroner's or doctor's report. *Id.* The primary purpose of such an investigation is to determine whether the adult needs protective services, which will be offered, but obviously is also to investigate when the death of a dependent adult occurs. KRS 209.030(9). Because the investigated abuse, neglect, or exploitation can have a criminal element, the Cabinet is also required to coordinate with law enforcement. KRS 209.030(6)(a).

Ordinarily, when services are offered to an adult, they may be declined. KRS 209.030(9). This is in line with the legislature's overall intent to "authorize only the least possible restriction on the exercise of personal and civil rights." KRS 209.090. Nevertheless, some adults lack capacity to decline services. To that end, the legislature established emergency access to protective services for such adults. KRS 209.100(1). Services may be ordered for such adults, after a hearing by a court, id. which must order the least restrictive interventions, KRS 209.100(2). The petition for these services is brought by the Cabinet. After the petition is filed, a guardian ad litem must be assigned to represent the interest of the adult, and the court must conduct the hearing on the matter as set forth in the statute. KRS 209.110. As a result of any orders by the court providing for protective services, the Cabinet must submit a report to the court describing the services provided once a month, for so long as the services are provided.

There is also a provision for an *ex parte* emergency order when an incapacitated adult will suffer "immediate and irreparable physical injury or death if protective services are not immediately provided." KRS 209.130(1). Such an order must be followed by an appropriate hearing within 72 hours (exclusive of Saturdays and Sundays). KRS 209.130(3).

In determining if protective services are needed, the Cabinet must investigate allegations about the adult. But it may not disclose this information to anyone, with a few carefully delineated exceptions, which include the party suspected of committing the abuse or neglect (and may withhold the names of informants from this party); persons within the Cabinet offices that may have a responsibility toward the adult; or other medical, psychological or social services agencies, or law enforcement agencies that have a legitimate interest *in the case.* KRS 209.140(1)-(3). In context, it is clear that the disclosure may be made to the persons or entities that are dealing with the specific event that required services, and with actually obtaining those immediate services for the dependent adult.

KRS Chapter 209 essentially deals with the process of obtaining protective services for adults who are unable to obtain their own protection. And the confidentiality provided by KRS 209.140 specifically applies only to an "investigation made *pursuant to this chapter.*" (Emphasis added.) "Adult," as used in the chapter, means a person, 18 years of age or older, "who, because of mental or physical dysfunctioning, is unable to manage his or her own resources, carry out the activity of daily living, or protect him or herself from neglect, exploitation, or a hazardous or abusive situation, without assistance from others." KRS 209.020(4).

Gary Farris, and others meeting this definition who died in care, were adults under this chapter. Investigations into their deaths were to be undertaken under the chapter, and the information revealed by those investigations was to be confidential, disclosable only to the limited persons and entities laid out in KRS 209.140. As noted above, this includes "social services

agencies ... that have a legitimate interest in the case." KRS 209.140(3).

**B. The council is not a social services' agency with a legitimate interest in the case under KRS 209.140(3).**

The entirety of Chapter 209 is directed toward dependent adults who are not able to fend for themselves, and are in a situation where they are being abused, neglected, or exploited. If family is available, a family member is either the perpetrator of the abuse, neglect, or exploitation, or fails to prevent it. This chapter is designed for the instances where the government must step in to protect this dependent adult.

If an adult under this chapter *dies,* the Cabinet must review a doctor's or coroner's report if abuse or neglect is alleged to be the cause of death. The investigator must "[m]ake a written report of the initial findings together with a recommendation for further action, if indicated." KRS 209.030(5)(d). Though the statute says nothing about making a final report at the end of the investigation, presumably one is made. The Cabinet's own regulations require that investigators "shall maintain a written record, as specified in KRS 209.030(5), to include: (a) [i]nformation reported in accordance with KRS 209.030(4); and (b) [a] narrative documenting ... [t]he investigation ... and ... [f]indings of the investigation." 922 KAR 5:070 § 4(3).

This is precisely the type of information that is made confidential by KRS 209.140. The purpose of these records is to allow the Cabinet to keep track of the case that it has a duty to investigate, wholly a function of internal operations.

The Cabinet also has standing to make a criminal complaint, KRS 209.150, in which case the written records have a limited use outside the Cabinet. Indeed, there may be times when the Cabinet is the only entity in a position to make such a com-

plaint, such as when the adult has no family, or other government agencies involved in the case do not do so. But once the criminal complaint is made, the case is pursued by police, who will do their own investigation, and prosecutors, who clearly are entitled to the investigative material as members of law enforcement with a legitimate interest in the case. KRS 209.140(3).

Significantly, the Act does provide for another report to be disclosed to persons or entities other than those listed in KRS 209.140. This report "summarizes the status of and actions taken on all reports [of alleged abuse] received from authorized agencies and specific departments," and it may not contain individual identifying information. KRS 209.030(12)(b). This annual report is provided to the Governor and the Legislative Research Commission. *Id.* This is the only statute that *requires* the Cabinet to make a report to entities outside itself.

It is of further significance that KRS 209.030(12)(b) also requires the Cabinet to make this report available to *community human services organizations.* The Council is such an organization, and it is entitled to that report.

But the Council is not a *social service agency* with a legitimate interest in the case under this chapter entitled to specific case investigative material for several reasons.

First, as used throughout the statutes, the term "agency" is applied to a governmental entity charged with carrying out some function on behalf of the executive branch of government, unless specifically stated otherwise. The term embodies the notion that employees performing the tasks are acting in the shoes of the government. Indeed, when discussing "agency" as used in this statute, *Black's Law Dictionary* describes it as "[a]n official body, *esp. within the government,* with the authority to implement and administer particular legislation." *Black's Law Dictionary* (10th ed. 2014) (emphasis added). The tasks as described in the statutes are directed toward performing a governmental function, such as providing protective services for a dependent adult. This is particularly true in a chapter that deals exclusively with providing protective governmental *services* to adults who meet the statutory definition.

Second, the exception to confidentiality in KRS 209.140(3) is designed to give day-to-day information about an individual to those agencies that need the information to do their jobs. Each of the exceptions aims at a specific purpose. Suspects have the right and need to know that they have been accused of conduct that could lead to a criminal charge, though even then, the legislature permitted the Cabinet to withhold the name of the informant unless ordered by the court to reveal it. KRS 209.140(1). Of course, the abused, neglected, or exploited person is entitled to know what any investigations into his or her life reveal. KRS 209.140(5). If a court orders release of the information, of course the Cabinet must comply, because it is certainly the presumption that the court will have a good reason to do so. KRS 209.140(4).

But the remaining categories involve action regarding the specific adult. The first is persons within Department for Community Based Services or other Cabinet departments that have a "legitimate interest or responsibility related to the case." KRS 209.140(2). Then there is the list of other agencies and providers that may need information about the case *to do their job.* These are medical and psychological treatment providers, and social service or law enforcement agencies that have a "legitimate interest in *the* case." KRS 209.140(3) (emphasis added). To read this exception to be a broad grant of access to

any group that might simply want to know, for whatever reason, is simply to read this section of the statute out of context and to ignore the purpose and intent of the whole chapter.

The phrase "legitimate interest in the case" means something narrower than a generalized interest in the type of case at issue. Note that the exception for persons in the department or cabinet is also limited to those "with a legitimate interest or responsibility related to the case." KRS 209.104(2). Employees of the Cabinet, given the nature of their work, obviously have a general interest in adult-protection investigations. Yet only some of the Cabinet's employees—those with a legitimate interest in *the* case—may have access to information revealed in an investigation.

The same qualifying phrase, "legitimate interest in the case," applies to social services agencies in KRS 209.140(3). It would be a bizarre reading of that phrase, however, if it meant that persons removed from the case in question but nevertheless employed by the Cabinet would be denied access, yet a non-profit organization with no interest in the case beyond a generalized desire for information about dependent-adult abuse, would be allowed access. Indeed, if that were the correct reading, any and all medical, psychological, and law enforcement agencies—the other agencies listed along with social services agencies in KRS 209.140(3)—could access the information if they can identify a generalized concern over safety of dependent adults. But it seems highly unlikely that the General Assembly intended the exception to be so broad as to allow, for example, police officers with no investigative connection to a given case of adult abuse to have access to the records of that case. Such a reading effectively nullifies the legitimate-interest-in-the-case qualifying language.

And it is significant that the legislature used different terms to describe who gets what degree of access to the Cabinet's information. The annual report to the Governor and Legislature that the Cabinet must make on all allegations of adult abuse, neglect, or exploitation, and the actions taken in each case must be made available to "community human services organizations," while the content of "investigations" may be given only to social services agencies with a legitimate interest in the case (or other appropriate excepted parties).

We must assume the disparate language used is intentional on the legislature's part. Indeed, the distinction makes sense. A *community* human services organization is a *local* organization only, tied to a specific community as the Council is here. The Council is funded partially by the Louisville Metro Government. No other governmental entity in the Commonwealth has been identified that financially supports its efforts. It does not appear to provide direct services to adults who would qualify under the statute, and certainly did not provide such services to the adults identified in its open-records requests. Instead, its mission is more humanistic, or policy oriented, as a watchdog or advocacy group: it is a *human services* organization. And it is a privately established organization, not an agent of the state. No one could reasonably argue that it is entitled to sovereign immunity as an arm, agent or alter ego of the state, even if it does receive some government funding.

On the other hand, a *social services agency*, in context with the other agencies entitled to disclosure, provides services on behalf of society at the behest of the government. The most probable example of this term is a nursing home, or group home, that is charged with providing for the "activity of daily living" and the "pro-

tection" of an individual adult under the chapter, such as under Supports for Community Living. Such an entity would be an agent of the state. An agency providing actual services to an adult under Chapter 209 certainly needs to know about the abuse, neglect, or exploitation that led to a particular adult being placed in its care, so that appropriate services, including medical and psychological services, as well as a safe living environment, could be provided. Or it would need to know if its policies or procedures are being violated, so that corrective action can be taken. Such an agency's need to know necessarily includes information that serves to identify the adult, and the legislature understandably did not require such private information redaction under KRS 209.140 for social service agencies as it did under KRS 209.030(12)(b) for community human services organizations.

This distinction is further supported by KRS 209.030(5)(b), which requires the Cabinet to notify "each appropriate authorized agency" when an investigation begins, and during the pendency of an investigation, as needed. It simply cannot be reasonably argued that the Cabinet is required to give the Council *notice* when an investigation is being started, and updates throughout as it is required to do for a social services agency. The point of such notice is to let the agency then involved with the adult know that there is an investigation related to this adult.

For example, a state-run residential home where the adult lives should be put on notice; or the police should be put on notice that abuse, neglect or exploitation has been alleged because the investigation information may be helpful in proceeding with criminal charges; or medical or psychological providers may need to know how their patient's injuries occurred. This language requiring notice to each appropriate authorized agency or treatment provider can *only* be referring to the agencies and providers listed as entitled to the otherwise confidential investigative information under KRS 209.140(3). Notifying agencies that are actually involved in an adult's case makes sense. Notifying the Council of every investigation in every case would be absurd.

And KRS 209.030(11) only requires the Cabinet to *consult* with "local agencies and advocacy groups," among others, to *encourage* these groups to share information with the Cabinet, and to allow the Cabinet to provide training about the abuse, neglect, and exploitation of adults and the services available to them. The Council is, by its own definition, such an advocacy group.

Thus, that local agency and advocacy groups do not have the legitimate interest in the case to obtain individualized case information is apparent through what the legislature has specifically said they should get: the annual report going to the Governor and the Legislative Research Commission, and consultation and training with the Cabinet to assist in promoting awareness of adult abuse, neglect, or exploitation and training on how to convey complaints to the Cabinet.

Another significant point is that while this case focuses on the death of a dependent adult, the vast majority of cases under this chapter focus on the *living* dependent adult. The effect of language in the statute must be determined based upon the entire intent and purpose of the chapter, which in Chapter 209 is to provide protective services to dependent adults, and which necessarily qualifies who needs confidential information, and why. Chapter 209 only references investigating the death of a dependent adult when there are allegations that the death is the result of abuse or neglect. The simple fact is that there are other agencies who investigate

deaths and how they occurred that are better suited to such an investigation, such as law enforcement. Of course, if the Cabinet learns of abuse or neglect in a state-run agency, whether it led to a death or not, it must notify law enforcement, and take steps to require the agency to correct the situation. But that is not covered under Chapter 209 either.

It might be a better policy to require the Cabinet, if it does any kind of investigation, to give the details to any group that wants to know about it. That would certainly comport with the Open Records Act's general policy. But the legislature has opted against such a broad policy and has carved out an exception to the general open-records policy by making the information sought in this case confidential. It is not our role to define that confidentiality away simply because advocacy or watchdog groups serve a valid purpose.

It is in fact easy enough to see why this information is allowed to be confidential, as the investigative materials no doubt contain sensitive personal information, and those aspects of the information that should be publicly available are adequately covered in the required annual report which is disseminated on request and is available to the Council. By limiting the investigative materials, while also allowing access to the report, the privacy rights of individuals are protected, and the public's interest in disclosure is satisfied. And there is little doubt that law enforcement will thoroughly investigate the death of a dependent adult to bring charges when appropriate.

Obviously, it also is in the Cabinet's best interest to correct situations allowing for abuse and neglect to avoid further complications. To assume the Cabinet is deliberately hiding such acts is specious. Further, given the somewhat duplicative nature of this request versus what is al-ready available to the Council, the actual burden on the Cabinet of producing potentially voluminous records, diverting funds and personnel to do so, is simply not justifiable.

**III.  Conclusion**

Despite its laudable purpose, the Council is not entitled to the information requested under the Open Records Act or KRS 209.140(3). Despite the broad policies in favor of disclosure and of strictly construing exceptions to disclosure, there is little question that the General Assembly has acted to maintain the confidentiality of the records at issue and to limit their disclosure to those persons and entities with a direct stake in the cases at issue. For that reason, the Court of Appeals is affirmed.

All sitting. Minton, C.J.; Barber and Keller, JJ., concur. Abramson, J., concurs in result only by separate opinion. Cunningham, J., dissents by separate opinion in which Venters, J., joins.

ABRAMSON, J., CONCURRING IN RESULT ONLY:

I very reluctantly concur in the result reached by the majority. As appropriate as I believe it would be for the Cabinet to have a statutory responsibility to make records such as those sought in this case available to the Council on Developmental Disabilities, Inc., I am forced to conclude that the legislature has not so provided. Undoubtedly, the citizens of the Commonwealth would benefit from knowing whether the Cabinet has fulfilled its obligations in providing safe placement and effective care to adults with intellectual and developmental disabilities, particularly in instances, such as here, where adults have died in the Cabinet's care. Giving the Council access would assure that information about such occurrences is acquired

and disseminated beyond the confines of the Cabinet and other state agencies, resulting in more accountability. It would also provide a significant benefit to families assessing placement and care alternatives for their disabled loved ones. Regrettably, that appropriate access must await a statutory change.

## CUNNINGHAM, J., DISSENTING:

The majority today holds that the Council on Developmental Disabilities, Inc. (the "Council") is not exempt from the Kentucky Adult Protection Act ("KAPA") confidentiality provision as enumerated in Kentucky Revised Statute ("KRS") 209.140. In formulating this conclusion, the majority finds that the Council is not a "social service agency" and has no "legitimate interest" in obtaining the requested records. For the following reasons, I respectfully dissent.

The Kentucky Open Records Act ("KORA"), KRS 61.871 *et seq.*, provides that "[a]ll public records shall be open for inspection by any person." KRS 61.872(1). The General Assembly enacted KORA based on the public's interest in having "free and open examination of public records." KRS 61.871. The intended purpose of KORA is "to make transparent the operations of the state's agencies." *Lawson v. Office of Attorney General*, 415 S.W.3d 59, 70 (Ky.2013). The free and open inspection of records must be allowed in order for the public to determine "whether the public servants are indeed serving the public...." *Kentucky Bd. of Examiners of Psychologists v. Courier-Journal & Louisville Times Co.*, 826 S.W.2d 324, 328 (Ky.1992).

The Council seeks disclosure of records created as a result of the Cabinet's investigation into the death of two adults in its care. The requested records were not created at the Cabinet's discretion, rather the Cabinet was required by law to conduct an investigation once informed that the decedents were possibly abused, neglected, and/or exploited. *See* KRS 209.030. Notwithstanding KORA's general rule in favor of dissemination, the requested investigatory records are subject to KAPA's confidentiality provision. *See* KRS 209.140 ("[a]ll information obtained by the [Cabinet], as a result of an investigation made pursuant to [KAPA], shall not be divulged to anyone...."). However, KAPA's confidentiality requirement is not absolute. The statute lists several individuals and agencies that are allowed to obtain the otherwise confidential investigatory records. Pertinent to our analysis is subsection (3) of KRS 209.140, which states that "[o]ther medical, psychological, or *social service agencies*, or law enforcement agencies *that have a legitimate interest in the case*" are exempt from the general rule forbidding dissemination of investigatory records.

The majority concludes that the Council is bound by KAPA's confidentiality provision because it does not qualify as a "social service agency", nor does it have a "legitimate interest" in obtaining the requested information. In support of its holding, the majority claims that the exemption applies to those agencies "that are actually involved ... in providing services" to the subject adults, thereby utilizing the protected information to further its services. Moreover, a "social service agency," the majority reasons, is one that "provides services on behalf of society at the behest of the government."

While not statutorily defined, the term "agency" is defined in the dictionary as "a business that provides a particular service" or "a government department that is responsible for a particular activity, area, etc." Merriam–Webster's Collegiate Dictionary, (11th ed. 2005). Moreover, "social

service" is defined as "organized philanthropic assistance (as of the disabled or disadvantaged)." *Id.* The dictionary also provides examples of social services, which include "various professional activities or methods concerned with providing social services (such as investigatory and treatment services or material aid) to disadvantaged, distressed, or vulnerable persons or groups." Merriam–Webster's Collegiate Dictionary, (11th ed. 2005). As further discussed, there is no doubt that the Council falls squarely within the ordinary meaning of the term "social service agency."

The Council was created in Jefferson County in 1952 as a non-profit organization with a mission to "initiate positive change on behalf of individuals with developmental disabilities by voicing their needs to the community; creating new choices for living, learning and participating; and ensuring the highest quality of life possible." The Council fits the ordinary definition of a social service agency based simply on its status as a non-profit organization that provides services in order to advance the welfare of disabled adults in the community.

In addition, the Council also meets the majority's strict description of social service agency. Despite the majority's claims to the contrary, the Council provides an array of services to adults in the Cabinet's care. Particularly, in regards to adults that are at a high risk for falling victim to abuse—individuals with mental disabilities that do not have "personal or family resources"—the Council serves as an advocate by way of conducting an unbiased, fair monitoring of the Cabinet's actions. In doing so, the Council improves the Cabinet's residential care in an attempt to prevent the abuse, neglect, and exploitation of disabled adults. The Council's assistance is therefore a direct service to those adults falling within the purview of KAPA; and,

records created and gathered as a result of an investigation made pursuant to KAPA would certainly further such service. It follows then, that the majority's social service agency definition is met, as the Council is a quasi-governmental agency, receiving partial funding from the Louisville Metro Government.

Turning to whether the Council has a "legitimate interest" in obtaining the requested records, the majority describes the Council as having "no interest in the case beyond a generalized desire for information about dependent-adult abuse." I disagree.

To understand the Council's interest in the records, it is important to note that historically adults with mental disabilities were institutionalized in large hospital-like settings. Recently, however, these individuals have been placed in residential settings, such as group homes. This trend is illustrated by Mr. Tardy's and Mr. Farris' residential transfers. While these smaller group homes are viewed as more appropriate for individuals with disabilities, abuse and neglect are more likely to occur without notice simply because there are fewer people around to observe what occurs on a day-to-day basis. For these reasons, the Council has an interest in obtaining the requested records as it serves as both a "watchdog" and advocate for individuals who are transferred to SCL programs.

As a "watchdog," the Council has an interest in the requested documents because they may shed light on whether the Cabinet is conducting prompt, thorough, and responsible investigations into possible abuse or neglect of group home residents. This interest is certainly legitimate as the records allow the Council to gauge whether the Cabinet is fulfilling its "statutory function." *See Courier Journal,* 826 S.W.2d at 328. Indeed, the Council is furthering a justifiable need for public

oversight of a governmental agency in order to protect the public's well being. *Kentucky New Era, Inc. v. City of Hopkinsville,* 415 S.W.3d 76, 81 (Ky.2013) (quoting *U.S. Dept. of Defense v. Federal Labor Relations Authority,* 510 U.S. 487, 495, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994)).

In the Council's role as advocate, it has an interest in the requested records in order to provide information and resources to consumers, families, and service providers concerning the quality of services in these group homes. The requested documents may also shed light on whether the Cabinet is abiding by professional standards and applicable regulations, and, if not, whether the disabled individuals are being placed in unsafe environments.

Based on the aforementioned reasons, I believe the Council meets the definition of a "social service agency" and has a legitimate basis for seeking and inspecting the requested records. It is a long standing and well respected watchdog organization having served a very worthwhile public interest for over 60 years. Thusly, I would reverse the opinion of the Court of Appeals and remand this case to the Franklin Circuit Court with instructions for it to order the Cabinet to produce for inspection the records sought in the Council's July 28, 2010, open records request.

For all of the above stated reasons, I dissent.

Venters, J., joins.