RENDERED: MARCH 22, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1040-MR

KHALIL COLEMAN APPELLANT

v.

APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
ACTION NO. 21-CR-00294-001

COMMONWEALTH OF KENTUCKY APPELLEE

AND

NO. 2023-CA-0454-MR

KHALIL COLEMAN APPELLANT

v.

APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
ACTION NO. 21-CR-00294-001

COMMONWEALTH OF KENTUCKY APPELLEE

\*\* \*\* \*\* \*\* \*\*

BEFORE:  CALDWELL, CETRULO, AND JONES, JUDGES.

CETRULO, JUDGE:  Appellant Khalil Coleman ("Coleman") was convicted of complicity to robbery in the first degree and sentenced to ten years of imprisonment by the Kenton Circuit Court.  In this consolidated appeal, Coleman appeals his conviction, an order denying his Kentucky Rule of Civil Procedure ("CR") 60.02 motion, and an order denying his motion for a new trial.

Coleman asserts the following claims of error:  (1) the trial court failed to make sufficient inquiry regarding whether Joshua Clarey ("Clarey") was invoking his right not to testify and whether limited questioning was possible; (2) the trial court permitted evidence regarding Coleman's out-of-state arrest and handgun possession, which was irrelevant and unduly prejudicial; (3) the trial court permitted evidence that portrayed Coleman as a bad father, which was unduly prejudicial; (4) the Commonwealth's closing argument impermissibly shifted the burden to the defense; (5) there was not sufficient evidence to convict Coleman of complicity to robbery in the first degree; (6) the trial court improperly denied an instruction on robbery in the second degree as a lesser included offense; (7) the errors in this case amounted to cumulative error; (8) the trial court improperly

denied Coleman's motion for a new trial; and (9) the trial court improperly denied Coleman's CR 60.02 motion.

Despite finding some error, we affirm Coleman's conviction and affirm the July 2022 order denying a new trial. However, finding the trial court did not fully address Coleman's CR 60.02 motion, we reverse and remand for an evidentiary hearing and/or additional findings related to this motion.

## I.    BACKGROUND

On February 15, 2021, Coleman drove south from the Milwaukee, Wisconsin area with Clarey in the passenger seat. Coleman drove to Indiana and picked up Johnny Hubbard ("Hubbard"). Hubbard and Coleman did not know each other prior to this meeting.[1] The three men then traveled to Elsmere, Kentucky. Coleman parked on Bridgegate Court in Elsmere, and Hubbard exited the vehicle. Hubbard walked up to a man standing outside a home two doors down from where Coleman parked. Hubbard threatened the resident with a handgun and the resident ran inside his home. With the help of others inside, the resident shut the door and locked it. A person inside the home called 9-1-1. No shots were fired, and no injuries were reported. Hubbard returned to the vehicle, and Coleman drove away.

---

[1] Both later testified to this fact.

Shortly thereafter, police pulled over their vehicle and arrested all three men without incident. Coleman, Clarey, and Hubbard were all charged with attempted robbery. Clarey and Hubbard entered plea deals, and Coleman proceeded to trial. Coleman, Hubbard, law enforcement officers, and the victims of the attempted robbery testified at Coleman's trial. Clarey was called by the defense to testify, but after a bench conference with the prosecutor, Coleman's attorney, and Clarey's attorney, Coleman's counsel withdrew his request to have Clarey testify.

During trial, Coleman and Hubbard's testimonies conflicted regarding the planning and attempted robbery. According to Hubbard, the plan to rob the house transpired because he needed between $10,000 to $20,000 to help with his mother's legal problems. So, around February 7, 2021, Hubbard reached out to Clarey's uncle, his drug supplier, and asked for marijuana to sell. Hubbard testified that instead of sending him the marijuana, Clarey's uncle offered Hubbard a "better opportunity," a robbery that would garner him, individually, at least $10,000 to $20,000. Hubbard testified that he did not know the address of the target home, but Clarey knew the address[2] and planned the robbery details.

---

[2] The men went to the wrong house. Coleman stated that Clarey put the Bridgegate address in his navigation system; however, the address entered was not the address that Hubbard attempted to rob. The address in the navigation system was two houses further down the street.

The targeted home supposedly belonged to someone in Clarey's uncle's drug network and was supposed to have substantial amounts of drugs and cash inside. Hubbard testified his role was to be a lookout during the robbery, but once they drove past the house, Coleman decided that Hubbard should be the one to "get in the house" because he would look less suspicious if seen by the neighbors. Hubbard testified that Coleman handed him a loaded 10-millimeter Glock handgun to use in the robbery. Hubbard stated that Clarey had a 9-millimeter Glock handgun with a 50-round magazine. According to Hubbard, those were the only two handguns in the vehicle.

Further, Hubbard testified that on Coleman's directive, he exited the vehicle and approached a resident of what he believed to be the target home. As he approached, Hubbard put his hand on the handgun in his front waistband and told the resident they needed to talk business in the house. The resident ran toward his front door. Hubbard testified that he "froze up" after the resident ran, but Clarey chased him. Hubbard stated that Clarey tried to catch the door before it closed, and repeatedly kicked the front door in an attempt to get into the home. Hubbard testified that he followed Clarey and also kicked the front door. After the residents successfully locked the door, Hubbard stated that he and Clarey ran back to the car. Hubbard got in the backseat; Clarey got in the front passenger seat; and Coleman calmly drove away. After they got back into the vehicle, Hubbard stated that he

handed the 10-millimeter handgun back to Coleman, and Clarey put his handgun in a bag on the backseat next to Hubbard. Hubbard testified that the men decided to return to the home later that day for another robbery attempt because they believed the target home, being involved in the drug trade, would not call the police.

In complete contrast to Hubbard's account, Coleman denied all knowledge of the planned robbery. He testified that he thought he was driving Clarey to Atlanta to sell a high-end watch. Both men had contacts in the Atlanta area who could help sell the $20,000 watch that Clarey had purchased after receiving a large legal settlement. Coleman believed Clarey was going to pay him something for his assistance with a percentage of the watch sale. Coleman testified that he used a vehicle rented by a friend for the trip, and Clarey rode in the passenger seat. On the way south, Clarey asked Coleman to stop in Indiana to pick up Hubbard and to drop him off in Kentucky with his kin. Coleman did not know Hubbard and did not want to make the detour, but eventually agreed. After Coleman picked up Hubbard, Clarey put the Kentucky destination in the navigation application on Coleman's phone. Upon arriving at the Kentucky address, Hubbard got out, ostensibly to be with his family, and Coleman remained parked to discuss the route to Atlanta and another possible unrelated detour with Clarey. Coleman testified that he did not watch where Hubbard walked, and Clarey did not exit the vehicle. Coleman testified that he thought Hubbard got

back into his car after being dropped off because they had somehow gotten the address incorrect, and Hubbard's family did not live there. Coleman stated he intended to drop off Hubbard at a nearby gas station, but before he could do so, police stopped his vehicle.

During Coleman's trial, the residents testified that they did not see Coleman or Clarey. The residents only saw Hubbard and the vehicle. The resident whom Hubbard approached later testified that he only saw "a black pistol," an "average looking gun." When the Commonwealth asked the resident if the handgun he saw had a 50-round magazine on it, he stated, "I couldn't really tell right off the bat." Upon further questioning, the resident stated the handgun he saw was "normal" but did not clarify if he did or did not see a 50-round magazine.

A law enforcement officer testified that the police immediately responded to the resident's 9-1-1 call. Shortly after receiving the call, an officer spotted the vehicle, and the backseat passenger matched the description of the assailant. The officer stated that when he first saw the vehicle, it looked like the occupants were arguing with each other. Hubbard testified that Coleman and Clarey were angry at him for freezing up and not getting in the house. Coleman testified that he was angry and arguing with Hubbard and Coleman because both had just admitted to him – after seeing the police cruiser – that they had active warrants.

-7-

An officer testified that police recovered two handguns during the arrest. Police did not fingerprint either handgun. One handgun was located in Coleman's hip holster. Police stated that Coleman immediately alerted them to this weapon. Coleman told police that he legally purchased the handgun, and he had a conceal carry permit for it. This testimony was not contested. The second handgun[3] was a 9-millimeter Glock handgun with a 50-round magazine, and it was located in a bag in the backseat of the vehicle. Coleman testified that Hubbard had a bag when he got into the vehicle; Hubbard said he did not have a bag when he got into the vehicle. Hubbard admitted that there were pictures on his phone of him holding guns, but he said those weapons were all confiscated when his mother was arrested on murder charges. Hubbard stated that he did not have access to, nor possess, guns since the police confiscated those weapons months prior to the attempted robbery.

Coleman, Clarey, and Hubbard were all charged with first-degree robbery.[4] Prior to Coleman's trial, both Clarey and Hubbard pled guilty to second-degree robbery.[5] A condition of Hubbard's plea deal was that he testify against

---

[3] It is not clear to whom this handgun with a 50-round magazine was registered.

[4] First-degree robbery carries a sentence of 10 to 20 years, with a requirement of serving at least 85% of the sentence.

[5] Second-degree robbery carries a sentence of 10 to 20 years, with a requirement of serving at least 20% of the sentence.

Coleman at his trial. As will be discussed further, Clarey did not testify at trial. Neither Hubbard nor Clarey had been sentenced at the time of Coleman's trial.

After a two-day trial, a jury found Coleman guilty of complicity to first-degree robbery and not guilty of unlawful transaction with a minor. The jury recommended the minimum sentence of ten years. Following the verdict, Coleman filed a motion for a new trial, which the trial court denied. Coleman then filed a CR 60.02 motion, which the trial court also denied. By order of this Court, Coleman's direct appeal (KY. CONST. § 115) was held in abeyance pending the CR 60.02 motion. We now address Coleman's consolidated appeal. Further facts will be developed as necessary.

## II.    ANALYSIS

### A.    There was sufficient evidence to convict Coleman of complicity to first-degree robbery.

"[T]o preserve an error based upon the insufficiency of the evidence the defendant must move for a directed verdict at the close of the Commonwealth's proof and must renew his motion at the close of all evidence[.]" *Commonwealth v. Jones*, 283 S.W.3d 665, 669 (Ky. 2009) (footnote and citation omitted). With each motion, the defendant "must state specific grounds for relief and should identify which elements of the alleged offense the Commonwealth has failed to prove." *Id.* "Merely moving summarily for a directed verdict or making a general assertion of insufficient evidence is not enough." *Id.* (citations omitted).

-9-

Here, defense counsel moved for a directed verdict at the close of the Commonwealth's case but did not state grounds for that relief. At the close of rebuttal evidence, the defense moved again to dismiss the case, but only cited "significant doubt" as to Coleman's guilt as the grounds. As Coleman failed to preserve the sufficiency-of-the-evidence issue, we limit our review to palpable error. *Jones*, 283 S.W.3d at 668 (citation omitted). Palpable error is one which "affects the substantial rights of the party" and relief may be granted if that error resulted in "manifest injustice." Kentucky Rules of Criminal Procedure ("RCr") 10.26.

Here, the jury was instructed on complicity (Kentucky Revised Statute ("KRS") 502.020) to attempted robbery first degree (KRS 515.020) and, in order to find guilt, the jury needed to believe Coleman *intended* for Clarey or Hubbard to take property and Coleman *intended* to aid them or stand ready to aid them. On appeal, Coleman argues that the Commonwealth failed "to present sufficient evidence of Coleman's intent that Hubbard and/or Clarey commit a robbery." He asserts that a "review of the evidence presented does not support the argument that Coleman had any idea what the two men were planning."

For example, Coleman points out that none of the victims saw him. Only three men were in the vehicle; Clarey did not testify, and Coleman's testimony directly refuted Hubbard's. Coleman asserts that Hubbard's testimony

did not match his statements to investigators, and that Hubbard had "powerful motive to cooperate with the Commonwealth." Additionally, Hubbard testified that there was no conversation about a robbery on the drive to Kentucky, and none of the written communications between Coleman and Hubbard presented at trial included "robbery" or "theft." Finally, throughout his testimony, Coleman vehemently denied knowledge or intent.

To rule on a motion for directed verdict, a trial court "must assume that the evidence for the Commonwealth is true, but [reserve] to the jury questions as to the credibility and weight to be given to such testimony." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). A defendant is entitled to a directed verdict of acquittal only "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt[.]" *Id.* (citation omitted).

Here, the Commonwealth's evidence, assuming it to be true, showed Coleman acquired a rental car, drove Hubbard and Clarey to Elsmere, Kentucky, where Hubbard (and possibly Clarey) exited the vehicle. After Hubbard threatened to rob a resident with a handgun, he got back in the vehicle, and Coleman drove away. Coleman admitted to driving the men to Elsmere and then driving away after Hubbard reentered the car. Hubbard admitted to attempting to rob the resident and threatening him with a handgun. Hubbard implicated Coleman in the planning of the crime and stated Coleman handed him the handgun to use in the

attempted robbery.  The Commonwealth introduced text messages that indicated

Coleman needed money but no one introduced messages about selling a "watch" or

a trip to "Atlanta."

In Kentucky, "[i]ntent can be inferred from the actions of an accused

and the surrounding circumstances.  The jury has wide latitude in inferring intent

from the evidence." *Anastasi v. Commonwealth*, 754 S.W.2d 860, 862 (Ky. 1988)

(citing *Rayburn v. Commonwealth*, 476 S.W.2d 187, 189 (Ky. 1972)).  Here, a jury

could reasonably believe from this evidence that Coleman intended for Clarey or

Hubbard to take property from the resident and Coleman intended to aid them or

stood ready to aid them.  The trial court did not err by denying Coleman's motion

for acquittal based on the sufficiency of the evidence.

**B.      The trial court did not err in denying an instruction on second-degree robbery as a lesser-included offense.**

The trial court instructed the jury on the elements of first-degree

robbery.  Coleman does not fault the trial court's instructions on that offense but

argues that the trial court committed reversible error in denying his request for

instructions on the lesser-included offense of second-degree robbery.  We

disagree.

> A person is guilty of second-degree robbery when "in the
> course of committing theft, he uses or threatens the
> immediate use of physical force upon another person with
> intent to accomplish the theft."  [KRS 515.030(1).]   A
> person is guilty of first-degree robbery when the elements

-12-

of second-degree robbery are met and the prosecution proves that either the perpetrator:

(1) *is armed with a deadly weapon*,

(2) uses or threatens immediate use of a dangerous instrument, or

(3) causes physical injury to the victim. [KRS 515.020(1)].

*Johnson v. Commonwealth*, 327 S.W.3d 501, 505-06 (Ky. 2010) (emphasis added).

The Commonwealth presented evidence sufficient to find the incident constituted second-degree robbery: the evidence showed that in the course of committing theft, Hubbard threatened the resident with the immediate use of physical force with the intent to accomplish a theft. Additionally, the Commonwealth presented evidence sufficient to find the incident constituted first-degree robbery: the evidence showed that in the course of committing theft, Hubbard threatened the resident with the immediate use of physical force with the intent to accomplish a theft, while armed with a deadly weapon.

An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense.

*Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998) (citing *Wombles v. Commonwealth*, 831 S.W.2d 172, 175 (Ky. 1992)).

Here, proof the perpetrator was armed with a deadly weapon (Hubbard's handgun) is the difference between second-degree robbery and first-degree robbery. However, the use of a handgun was never contested. Coleman did not argue that Hubbard did not threaten the resident with a handgun. He maintained he did not have knowledge or involvement in the attempted robbery. If the jury believed Coleman – that he was not involved in the attempted robbery – he could have been found *not guilty of both charges*. If the jury did not believe Coleman – and thought he had knowledge and/or involvement in the attempted robbery – then the jury had enough evidence, as presented by the Commonwealth, to find *guilt of both charges*. Here, an instruction on a lesser included offense was not required because the jury could not have had reasonable doubt about the greater offense yet believe beyond a reasonable doubt that he was guilty of the lesser offense. *See id.* Therefore, the trial court did not err when it denied jury instructions of the lesser-included charge of second-degree robbery.

**C.** **Any possible error regarding Clarey's Fifth Amendment rights was waived when Coleman withdrew his request to have Clarey testify.**

On appeal, Coleman challenges the trial court's treatment of Clarey's Fifth Amendment rights as an all-or-nothing proposition, which then prevented Coleman from exercising his Sixth Amendment right to compel Clarey to testify as a witness. Coleman argues that "[a] witness can be called to testify about relevant

matters that do not involve the invocation of the privilege, or the scope of cross examination could be limited to avoid the invocation of privilege." Coleman argues that the trial court should have conducted further questioning to ascertain whether and upon what questioning Clarey intended to take the Fifth.

Clarey was put in the witness box before the jury was present in the courtroom. However, the trial court held proceedings, with Clarey remaining in the witness box, until Clarey's defense counsel could be summoned. After Clarey's defense counsel arrived, the court asked Clarey's attorney if he knew how his client intended to testify. The conversation moved to a bench conference with the prosecutor, Coleman's defense counsel, and Clarey's defense counsel. The court aptly stated that Clarey could not use his Fifth Amendment rights regarding facts he had already stated on the record, but he could "take the Fifth" for other matters from his past. Clarey's defense counsel appeared unaware of how Clarey intended to testify, but stated Clarey had been warned against making statements inconsistent with previous testimony.

Also, during the bench conference, there was disagreement as to what Clarey had already stated on the record. It appeared that Clarey had already pled guilty but had not elocuted as to the details of the crime nor been sentenced. It is unclear from our record if Clarey implicated Coleman in the crime or merely placed him as the driver. The trial court stated that, although Clarey "did not go

-15-

into a great deal of detail" during his guilty plea, Clarey could "put himself in jeopardy" if he testified at Coleman's trial contrary to anything he had stated under oath during that guilty plea. The trial court could not remember everything Clarey testified to during his guilty plea but wanted his counsel to be aware of his risk of perjury. The prosecutor and Coleman's defense counsel then disagreed as to what Clarey did or did not state during his guilty plea. The prosecutor asserted Clarey implicated Coleman in the attempted robbery and admitted that they were "all in on it." However, Coleman's counsel stated that he was present at Clarey's guilty plea and Clarey *did not* inculpate Coleman. According to Coleman's defense counsel, Clarey only placed Coleman as the driver and nothing more; he claimed that saying Coleman was the driver was not the same as saying he had knowledge of the crime.

Coleman's counsel asked for a moment to confer with his client. After a short conversation, Coleman's counsel stated to the court, "my client will agree to withdraw the request for Mr. Clarey to testify. That should resolve that issue." However, on appeal, Coleman asserts that the trial court should have ascertained whether and upon what questioning Clarey might have "taken the 5th."

In *Combs v. Commonwealth*, 74 S.W.3d 738 (Ky. 2002), the Supreme Court indicated that the trial court should conduct a "preliminary inquiry" or "dry run of [witness's] testimony" to determine if limiting the scope of questioning

could allow both the witness's Fifth Amendment protections *and* the defendant's Sixth Amendment rights. The Court also found "it improper to simply assume that [the witness] would invoke the privilege as to questions she was never asked." *Id.* at 744-45; *see also McLemore v. Commonwealth*, 590 S.W.3d 229, 236-40 (Ky. 2019);[6] *see also McRae v. Commonwealth*, 635 S.W.3d 60, 66-67 (Ky. 2021).[7] It is argued that the trial court should have either held a "dry-run" questioning, or minimally, sought further clarification *from Clarey* to determine what he intended to testify to and if the scope could have been limited. *See Combs*, 74 S.W.3d at 744-45; *McLemore*, 590 S.W.3d 238-40; and *McRae*, 635 S.W.3d at 66-67.

However, this alleged error was waived when Coleman withdrew his request to have Clarey testify. Forgoing the opportunity to question a witness is an "invited error" that is not subject to appellate review. *Gray v. Commonwealth*, 203 S.W.3d 679, 686 (Ky. 2006); *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 38 (Ky. 2011) (citing *United States v. Perez* 116 F. 3d 840, 845 (9th Cir. 1997))[8]

---

[6] *McLemore*, 590 S.W.3d 238-40 (affirming *Combs* and reiterating the need for the trial court to move past speculation as to what the witness might testify to).

[7] *McRae*, 635 S.W.3d at 66-67 (affirming *Combs* and reiterating that the trial court should use its discretion to allow, but limit, the scope of questioning to permit the witness's Fifth Amendment protections *and* the witness's Sixth Amendment rights to questioning).

[8] In *Perez*, the U.S. Court of Appeals for the Ninth Circuit distinguished between a "forfeited" right and "waived" right. *Perez*, 116 F.3d at 845-46. A *forfeited* right is one that was not objected to at trial, not deliberately relinquished, and is reviewed only for plain error. *Id.* at 846. A *waived* right is one that was known to the defendant but abandoned, "intentionally relinquished," and therefore unreviewable. *Id.* at 845. Our Supreme Court applied this *Perez* rule in *Quisenberry*, 336 S.W.3d at 38. In *Quisenberry*, the defendant asked for facilitation jury

-17-

("[I]nvitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review."). Here, Coleman clearly knew about his right to call Clarey as a witness (as there was much conversation about it during a bench conference), but advised his attorney to withdraw that request. As such, we find Coleman waived his claims regarding Clarey's testimony, or lack thereof, at trial.

> **D.     The trial court abused its discretion by admitting into evidence a handgun confiscated from Coleman during an out-of-state arrest, but that error was harmless.**

During cross-examination, the prosecutor asked Coleman about an arrest in Wisconsin that took place months after the attempted robbery. In response, Coleman explained that a letter informing him of his next court date was sent to the wrong address, so he never received the notice and missed his court date. As a result, the U.S. Marshals located him in Wisconsin, arrested him, and confiscated a handgun found on his person at that time. The prosecutor asked,

> Despite the fact that you'd just been arrested for a class B felony in Kentucky, you're out on bond for that class B felony, robbery first degree charge, a very serious offense, with all the disruption in your life that this caused, you went back out and got another gun?
>
> . . .

---

instructions to be included as a lesser included charge. *Id.* at 37. The jury found him guilty of facilitation, then he argued on appeal that the evidence did not support the finding of guilt as to facilitation. *Id.* However, our Supreme Court found that the defendant *waived* any claim that the evidence was insufficient as to facilitation because the defendant was the party who requested the facilitation jury instructions. *Id.* at 38 ("[The defendant's] express representation to the trial court that the evidence of facilitation was sufficient, waived his right to claim on appeal that it was not.").

Did you or did you not go back out and arm yourself again?

To which Coleman answered, "Yes, sir. I did."

Coleman's counsel objected and argued this arrest was irrelevant to the crime charged, the handgun was legally in Coleman's possession,[9] and questioning about this handgun should not be allowed. The prosecutor argued that it was relevant as character evidence, *i.e.*, to show Coleman was not the upstanding citizen he claimed to be, to show he *was* the type of person who commits crime. The court ruled that the handgun "is obviously evidence" and admitted the handgun into evidence.

This matter is properly preserved due to the defense's relevancy objection, and we review the trial court's decision to admit this evidence for an abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007) (citation omitted). The test for abuse of discretion is whether the trial court's decision "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id*. (internal quotation marks and citation omitted).

---

[9] During cross-examination, the prosecutor did not challenge the truthfulness of Coleman's recitation of the facts, *e.g.*, the fact that the letter was sent to the wrong address; Coleman legally purchased and owned the handgun; Coleman possessed a current concealed carry permit; and at that time, his pretrial bond did not disallow gun possession (although it subsequently became a condition). In its appellee brief, the Commonwealth states that Coleman admitted his Wisconsin handgun possession was in violation of his bond conditions, but the record does not support that statement. Coleman testified that he had no knowledge of a bond condition preventing gun possession at that time, and the Commonwealth did not put forth any evidence of such a bond restriction.

On appeal, Coleman argues the trial court should not have permitted the prosecutor to question Coleman about the post-arrest handgun purchase because it was irrelevant and prejudicial.[10] The Commonwealth asserts that it questioned Coleman on the stand about the post-arrest handgun purchase to refute the defense's portrayal of Coleman as an upstanding citizen and social-justice activist.

Here, the handgun later confiscated in Wisconsin should not have been admitted because it was not relevant. *See* KRE 402. It was not relevant because it did not "hav[e] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* KRE 401. The Commonwealth was not attempting to connect the handgun confiscated in Wisconsin to any element of the attempted robbery in Kentucky; the Commonwealth was using the confiscated handgun to show Coleman had the propensity to arm himself with handguns. The

---

[10] Questions involving the Wisconsin arrest resulted in two admissions: the handgun confiscated in Wisconsin *and* the character testimony. The briefs on appeal conflate those two admissions. On appeal, Coleman briefly notes the dual admission: "The trial court abused its discretion in allowing the introduction of this evidence, both testimonial and physical." However, Coleman's legal argument, relying almost solely on *Harris v. Commonwealth*, 384 S.W.3d 117, 123 (Ky. 2012), appears focused on the handgun admission alone, not the testimonial admission. In this section, Coleman does not mention Kentucky Rule of Evidence ("KRE") 404(a) (excluding, with exceptions, character, or trait evidence) or KRE 404(b) (excluding, with exceptions, testimony about prior bad acts and propensity arguments). As Coleman focuses on the handgun admission, so shall we. Indeed, we cannot create an argument for an appellant; Kentucky Rule of Appellate Procedure ("RAP") 32(A)(4) requires the *appellant* to present a legal argument for our review.

prosecutor asked Coleman, "Did you or did you not go back out and arm yourself again?"

Further, "[w]eapons that are known to have no connection to the crime . . . are generally not admissible." *Harris v. Commonwealth*, 384 S.W.3d 117, 123 (Ky. 2012) (citing *Major v. Commonwealth*, 177 S.W.3d 700, 710-11 (Ky. 2005)). In *Harris*, the defendant was found guilty of murder. *Id.* at 122. During the trial, the court admitted into evidence two handguns the defendant owned, which were similar to the murder weapon but not used to commit the crime. *Id.* The trial court admitted the two handguns – not because they were connected to the crime alleged – but, rather, "on the grounds that they tended to show [the defendant] preferred and was familiar with this type of weapon." *Id.* On appeal, our Supreme Court stated that in order for weapons to be admitted, there needed to be a nexus between the weapons and the crime being alleged. *Id.* at 123. "Weapons may be admitted where there is a possible connection to the crime but that connection is not definitively established." *Id.* By way of example, the Court cited three cases in which there was the requisite connection:

> In *Sweatt v. Commonwealth*, 550 S.W.2d 520 (Ky. 1977), the Court admitted a gun found in the defendant's bedroom that matched the victim's description of the gun used in the crime, though the gun could not definitely be identified as the weapon used in the crime. In *Barth v. Commonwealth*, 80 S.W.3d 390 (Ky. 2001), the Court admitted wooden window slats whose size and shape matched marks on the victim's body, though the victim

was blindfolded during the attack and could not identify the weapons used. And in *Grundy v. Commonwealth*, 25 S.W.3d 76 (Ky. 2000), the Court admitted a piece of concrete the victims claimed to have found near the scene of the crime, though it could not be conclusively ascertained the concrete was used in the crime. In all of these cases, it was possible the weapon was used in the crime and there was sufficient identification and nexus to justify admitting the weapon.

*Id.*

However, the handguns that the prosecution attempted to admit in *Harris* had no nexus or connection to the crime. *Id.* at 124. Therefore, the Court ruled their admission was improper. *Id.* There, the admitted handgun evidence was "evidence of ownership and nothing more, certainly not a personal habit that was relevant to proving his conduct on a particular occasion." *Id.* The Court stated that "in cases where it is shown the weapon was not used in the crime, the weapon is irrelevant and, consequently, inadmissible." *Id.* at 123 (citing *Commonwealth v. Marshall*, 743 A.2d 489, 492 (Pa. Super. Ct. 1999)).

Similarly, the handgun on Coleman's person, which law enforcement in Wisconsin subsequently confiscated, was in no way connected to the February 15 attempted robbery. As in *Harris*, this handgun was irrelevant to the crime alleged and should not have been admitted at trial.

However, our analysis next turns on whether this error was harmless; RCr 9.24 requires us to disregard harmless error. Harmless error is that which "would be inconsistent with substantial justice" and affects the "substantial rights

of the parties." RCr 9.24. This requires us to determine "with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009) (citation omitted). "Our inquiry is not simply whether there is enough evidence to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Ordway v. Commonwealth*, 391 S.W.3d 762, 774 (Ky. 2013).

In *Harris*, our Supreme Court found that, although the admission of the handguns was error, it was harmless because of the breadth of additional evidence to support the jury's finding of guilt. *Harris*, 384 S.W.3d at 124-25. The crime in *Harris* had an eyewitness who had personal knowledge of the alleged shooter; the defendant was on a surveillance video in the vicinity of the shooting; and another witness testified the defendant told him he had shot the victim. *Id.* at 125. The Court concluded that the judgment "was not substantially swayed by the admission of the handguns, and the error is therefore harmless." *Id.*

Here, while we certainly do not have the same breadth of evidence as in *Harris*, we cannot say with fair assurance that the judgment was substantially swayed by the error. *See Winstead*, 283 S.W.3d at 689. The jury was not led to believe this handgun confiscated in Wisconsin was connected to the attempted robbery of February 15. Also, this handgun admission was not the sole connection

-23-

between Coleman and guns. Prior to the improper handgun admission, Coleman testified that he purchased guns legally and generally carried them on his person in a hip holster. The jury saw bodycam video reflecting his revelation to police of his concealed carry permit. Admission of this handgun later confiscated in Wisconsin, while not relevant, confirmed gun ownership to which he had already admitted. As such, the jury was not likely swayed by the improper admission of this handgun evidence. Thus, we find this error was harmless because it did not affect Coleman's substantial rights. *See* RCr 9.24. We can say with fair assurance that the judgment was not substantially swayed by the error. *See Winstead,* 283 S.W.3d at 689; *see also Ordway*, 391 S.W.3d at 774.

   E.   **The trial court did not err by allowing testimony about Coleman's familial relationships.**

Next, Coleman argues the trial court erred by allowing unduly prejudicial evidence that portrayed Coleman as a bad father. While Coleman was testifying, the prosecutor asked him questions about the timing of his trip by walking him through his text messages to Clarey, and messages to his daughter's mother. The prosecutor asked whether Coleman was going to miss his daughter's birthday. Coleman stated that he wanted to be back in time for her birthday but brought a present to his daughter's house before he left. Coleman stated that he arrived at his daughter's mother's house and asked over text if his daughter could come out of the house so he could give her a present and a hug. His child's mother

-24-

stated that the child was sleeping, and she did not want to wake her. A disagreement over text ensued, and Coleman left the present at the front door. After this admission, the Commonwealth continued to ask questions about this argument; Coleman's counsel objected; and the parties approached the bench.

At the bench conference, Coleman's counsel stated, "He's asked and answered. Seems like beating a horse to death here." The prosecutor replied that Coleman was avoiding answering the question directly, but Coleman's counsel disagreed. The trial court asked the prosecutor about the line of questioning. The prosecutor responded that he was trying to show that Coleman was "so desperate for money" that he was planning to skip Valentine's Day and was willing to miss his daughter's birthday. The trial court overruled the objection and told the prosecutor, "You've made your point," but allowed the prosecutor to ask another follow-up question. At no point during the bench conference did Coleman's attorney make an argument regarding the prejudicial effect of the questioning.

Now, Coleman raises a new rationale: that this line of questioning was unduly prejudicial and inadmissible character evidence. Though Coleman's counsel did timely object, counsel did so because the question had been asked and answered. A party claiming error on appeal may not present a different argument from what was raised at the trial court. *Elery v. Commonwealth*, 368 S.W.3d 78, 97-98 (Ky. 2012) (citation omitted). As such, we must limit our review of this

-25-

claim for palpable error. *Id.* at 98. Again, palpable error is one which "affects the substantial rights of the party" and relief may be granted if that error resulted in "manifest injustice." RCr 10.26.

We cannot conclude that the Commonwealth's questions regarding the timing of Coleman's trip south, and the events he may or may not have missed while gone, resulted in manifest injustice. As the Commonwealth correctly argues, evidence showing Coleman's need to make money was relevant as to motive to commit the robbery and was admissible under KRE 404(b). *See Meredith v. Commonwealth*, 164 S.W.3d 500, 506 (Ky. 2005) (concluding that evidence of the defendant's unpaid child support was admissible pursuant to KRE 404(b) to show his motive to commit robbery). We cannot say that this line of questioning was unduly prejudicial as that knife could have cut both ways. On one hand, it showed Coleman was willing to miss events important in his daughter's life, but on the other hand it showed that he attempted to see his daughter before he left town and left her a present. Keeping our focus on the law, and not parenting preferences, we cannot find this testimony to be more prejudicial than probative. *See* KRE 403. We find no palpable error in this evidence because it did not result in manifest injustice.

**F.    The prosecutor improperly shifted the burden of proof during closing arguments, but that error is not reversible.**

During the closing arguments, the prosecutor argued that the lack of evidence *was* evidence.  The prosecutor stated, "I'm not suggesting it's their burden; it's not, it's my burden," then continued to shift the burden.  The prosecutor stated:

> There is no corroboration; there is no mention of a watch. There are tons of unanswered questions like what to do with Johnny Hubbard.  But, the defense would just have you believe that you have to follow this convoluted story that doesn't have corroborating evidence, that should exist if it were true they want you to believe it because they want you to believe that Mr. Coleman is an upstanding member of the community that he is involved in social justice, and that he works with kids and he does volunteer services has a company and goes to schools and maybe he does, I don't know.  What I do know is that they have not called a single witness that can verify or corroborate statements that have only been made by []Coleman.  Not a single person has traveled down here from Milwaukee and taken this witness stand and verified yes, he is an upstanding member yes he is a leader in our community, yes he is a part of the social justice movement.  I'm not knocking any of those things.  I'm not knocking social justice.  I'm not knocking people who work with kids if he's actually doing that, that's great, but I put to you that they're the ones that claimed that's why you should believe him yet they haven't brought a single person to corroborate Mr. Coleman's testimony[.]

Coleman's counsel objected, arguing "you can't bring witnesses down just for collateral purposes."  Coleman's counsel did not specifically object due to

the prosecutor's burden-shift; however, that shift is the foundation of the argument on appeal.[11]

> [KRS] 500.070 states that "[t]he Commonwealth has the burden of proving every element of the case beyond a reasonable doubt . . . ." Further, "[a]s the presumption of innocence mandates that the burden of proof and production fall on the prosecution, any burden-shifting to a defendant in a criminal trial would be unjust." *Butcher v. Commonwealth,* 96 S.W.3d 3, 10 (Ky. 2002). In reviewing a claim of an improper closing argument, this Court must keep in mind "the wide latitude we allow parties during closing argument," *Dickerson v. Commonwealth*, 485 S.W.3d 310, 331 (Ky. 2016), and must consider the closing argument as a whole, *Miller v. Commonwealth*, 283 S.W.3d 690, 704 (Ky. 2009).

*Mulazim v. Commonwealth*, 600 S.W.3d 183, 194 (Ky. 2020).

Here, the prosecutor essentially argued in closing that Coleman needed to *prove his innocence*: he needed to present witnesses showing he was a social activist; he needed to demonstrate he was an upstanding member of his community; he needed to corroborate his own testimony in order for it to be believable. Based on these closing remarks, the jury could have assumed that Coleman had a duty to prove his innocence through witness testimony, instead of

---

[11] Again, a party claiming error on appeal may not present a different argument from what was raised at the trial court. *Elery*, 368 S.W.3d at 97-98 (citation omitted). When an issue is not properly preserved in this manner, we limit our review to palpable error. *Id*. at 98. Palpable error is one which "affects the substantial rights of the party" and relief may be granted if that error resulted in "manifest injustice." RCr 10.26. However, here, this palpable error review is integrated into the prosecutorial misconduct analysis below. *See Brafman v. Commonwealth*, 612 S.W.3d 850, 861-63 (Ky. 2020).

the prosecutor bearing the burden of proving his guilt beyond a reasonable doubt. Therefore, the burden-shift was improper. However, such shift is reversible only if proof of the defendant's guilt was not overwhelming, if defense counsel objected, and if "[t]he trial court failed to cure the error with a sufficient admonishment to the jury." *Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky. 2002) (citations omitted).

First, proof of Coleman's guilt was not overwhelming. The jury did have sufficient evidence for a finding of guilt because, as discussed previously, Hubbard admitted to the elements of first-degree robbery, and Coleman drove Hubbard to and away from the scene of the attempted robbery. The jury could have simply believed Hubbard and not Coleman. And yet, this evidence is "not overwhelming." Coleman's guilt was established by Hubbard's testimony and not much else. For example, the residents did not see Coleman, Clarey did not testify, and the police did not fingerprint the handguns found in the vehicle on February 15. Therefore, Hubbard's fingerprints were not found on the handgun taken from Coleman's waist holster – to prove Hubbard used that handgun during the attempted robbery – and Coleman's fingerprints were not found on the handgun located in the bag in the backseat. Further, evidence showed Clarey, not Coleman, searched for the Elsmere address prior to leaving Milwaukee. The Commonwealth admitted that Clarey, not Coleman, showed Hubbard a picture of

the man they were supposedly going to rob.  While the prosecutor spent time discussing Coleman's phone, there were no text messages from Coleman discussing a robbery, theft, drugs, or Kentucky.

However, the absence of a *pertinent* objection – a *specific* burden-shift objection – is crucial to our *Barnes* analysis.  The *Barnes* conditions require an *opportunity for the trial court to cure* through admonition; implicit in that requirement is the need for the objection to be timely and on-point, in order for the trial court to have that opportunity to fashion a remedy.  *See Winstead*, 283 S.W.3d at 688 (finding the defendant was not entitled to relief due, in part, because the objection was neither timely nor specific and "did not direct the trial court's attention to the ground of objection advanced on appeal"); *see also Lanham v. Commonwealth*, 171 S.W.3d 14, 29 (Ky. 2005) (characterizing an objection without a request for an admonition as "incomplete," and noting that a defendant must "ask for a remedy in order to get the remedy"); *see also Robinson v. Commonwealth*, No. 2009-SC-000278-MR, 2010 WL 3722789, at *4 (Sep. 23, 2010).[12]  Here, Coleman did not object to the burden-shift, thereby failing to give the trial court the opportunity to rule on those grounds or correct through admonition.  While Coleman's guilt was not overwhelming, the prosecutorial

---

[12] This case is not published; therefore, it is not binding precedent.  RAP 41.  We cite to it merely as persuasive because it is more factually similar to the situation before us than other published decisions we reviewed.

misconduct does not warrant reversal under *Barnes*, as there was not a relevant objection.

Furthermore, the misconduct was not flagrant. *Barnes*, 91 S.W.3d at 568 (citations omitted). To determine if the misconduct was flagrant, the Court weighs four factors:

> (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused. We look at the claimed error in context to determine whether, as a whole, the trial was rendered fundamentally unfair.

*Brafman v. Commonwealth*, 612 S.W.3d 850, 861 (Ky. 2020) (citations omitted).

Applying *Brafman*, the prosecutorial burden shift may have misled the jury, but, likely not for long. Shortly after closing arguments, the jury was presented with instructions, which clarified the jury's duty. Specifically, Jury Instruction No. 2 stated that

> The law presumes a defendant to be innocent of a crime, and the indictment shall not be considered as evidence or as having weight against the defendant. You shall find the defendant not guilty unless you are satisfied from the evidence alone, and beyond a reasonable doubt that he is guilty. If upon the whole case you have a reasonable doubt that the defendant is guilty, you shall find him not guilty.

Finally, the remarks were isolated to closing arguments and were not emphasized throughout the trial. The improper burden-shift comments appeared to

be unintentional as they followed an admission by the Commonwealth that it retained the burden. The prosecutorial misconduct was not flagrant, did not render the trial fundamentally unfair, and therefore does not warrant reversal.

### G. We decline to find cumulative error.

On appeal, Coleman argues the cumulative effect of the preceding errors was to render his trial fundamentally unfair.[13] This was largely a case in which the jury was asked to weigh the credibility of Coleman against Hubbard as to intent and knowledge.

Admission of irrelevant evidence was harmless. The prosecutor improperly shifted the burden of proof during closing arguments, but that error was not reversible and did not render the trial fundamentally unfair. Cumulative error is "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).

We do not find that Coleman's trial was fundamentally unfair. "Although errors crept into this trial, as they inevitably do in a trial . . . they did

---

[13] Coleman also argued that "[t]he acquittal on one charge demonstrates that the jury did believe part of Coleman's testimony, and they would have believed all of it but for the preceding errors." We note this statement is not necessarily accurate. *Both* Hubbard and Coleman testified that they did not know each other prior to Hubbard getting into the car on February 15. As such, the jury could have believed Hubbard, Coleman, or both, in determining Coleman was not guilty of an offense that required him to have knowledge of Hubbard's age (KRS 530.065).

-32-

not, either individually or cumulatively, render the trial unfair." *Brown*, 313 S.W.3d at 631.

For the foregoing reasons, we affirm Coleman's conviction and sentence.

**H.     The trial court did not err in denying Coleman's motion for a new trial.**

Following the trial, the defense filed a motion for a new trial requesting "all witnesses [] be permitted to testify without threat of prosecution." Coleman stated that Clarey's plea agreement included language that prevented him from testifying at Coleman's trial. Moreover, he argued:

> At the Coleman trial, [] Coleman was deprived of his right to call witnesses in his favor by the threats made against a witness with exculpatory evidence. [] Coleman did not know how [] Clarey would testify when he called him to the stand. However, it was made quite clear in front of the Court that [] Clarey could not offer exculpatory testimony or he would face additional charges which gave the impression that no exculpatory evidence could be obtained from [] Clarey. It is now known that the contrary is true. [] Clarey could have, in fact, provided exculpatory evidence which may very well have persuaded the jury that [] Coleman was not guilty of the charge of which he was convicted.

With this motion, Coleman attached a handwritten statement that was titled "Affidavit Statement" and signed by Clarey. In that statement, Clarey explained that he lied to Coleman about the robbery and Coleman was unaware of the robbery plan. The Commonwealth opposed the motion and stated that Clarey's

-33-

plea agreement did not prevent him from testifying at Coleman's trial. The Commonwealth challenged the characterization of Clarey's handwritten statement as an "affidavit" and argued the statement did not qualify as newly discovered evidence.

Next, Coleman filed a supplement and claimed that Clarey's plea agreement "deliberately suppressed exculpatory evidence," a clear *Brady*[14] violation. Coleman attached to that supplement Clarey's CHIRP[15] activity – copies of text messages sent by Clarey while in jail through a monitored system – that exculpated Coleman. Additionally, Coleman argued that Clarey's handwritten statement *did* legally qualify as newly discovered evidence. Finally, Coleman argued that improper threats and intimidation occurred during the Fifth Amendment bench conference held during Coleman's trial which essentially forced Clarey not to testify, and this resulted in a violation of Coleman's constitutional rights.

---

[14] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "In *Brady*, the United States Supreme Court held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Commonwealth v. Parrish*, 471 S.W.3d 694, 697 (Ky. 2015) (quoting *Brady*, 373 U.S. at 87).

[15] The Commonwealth stated, Jail (CHIRPS) are effectively text messages inmates use to communicate with friends and relatives on the outside. Every inmate has access to the system, which is maintained by a communications contractor doing business with the detention center.

The Commonwealth filed a response in opposition arguing that Clarey's plea agreement "neither required [Clarey] to testify against his co-defendants, nor prohibited [him] from testifying either." The Commonwealth argues preservation concerns in Coleman's argument – specific to the Fifth Amendment bench conference during Coleman's trial – due to Coleman's withdrawal of his request for Clarey to testify. Further, the Commonwealth challenged the admissibility of Clarey's CHIRPS messages and the weight they should carry if deemed admissible.

The trial court entered an order denying the motion without an evidentiary hearing. The court denied that any threats or impropriety occurred during the Fifth Amendment bench conference in Coleman's trial. The trial court admitted there was a "distinct possibility" that Clarey overheard the bench conference but that "[a]s Clarey was leaving the witness stand he did not show any signs of being intimidated or threatened."

Additionally, the trial court stated it reviewed the CHIRPS messages. The court acknowledged the Commonwealth was required to turn over exculpatory evidence to the defense, but taking the Commonwealth's statement as true, stated that the Commonwealth did not have the CHIRPS prior to trial and therefore could not have turned them over to the defense. The court stated that either party could have obtained the CHIRPS, and the Commonwealth was not obligated to provide

them to the defense. As such, the trial court ruled that there was no *Brady* violation, and the CHIRPS were not newly discovered evidence because the main exculpatory CHIRP ("bro is innocent of everything") was actually dated prior to Coleman's trial. Finally, the trial court found Clarey's handwritten statement to be unpersuasive and "untrustworthy."

This Court will "review the trial court's denial of [an] Appellant's new trial motion for abuse of discretion." *Hall v. Commonwealth*, 337 S.W.3d 595, 613 (Ky. 2011) (internal quotation marks and citation omitted).

On appeal, Coleman argues the Commonwealth had a duty under *Brady* to obtain and disclose Clarey's CHIRPS. He challenges the trial court's finding that the Commonwealth was not obligated to turn over the messages because those CHIRPS could be obtained by either party. Coleman argues that the Commonwealth can be imputed with constructive knowledge of materials from other government agencies, including the police, and the prosecutor had a duty to learn of the CHIRPS messages and to share them with the defense.

Coleman argues that the trial court abused its discretion in denying his motion for a new trial because there was "a reasonable probability that Coleman would have been acquitted if he had received the CHIRPS pretrial." Under *Brady*, a violation of a defendant's due process rights occurs when the prosecution withholds evidence that tends to exculpate the accused. *Brady*, 373 U.S. at 87-88.

Our Supreme Court has clarified that "*Brady* concerns those cases in which the government possesses information that the defense does not and the government's failure to disclose the information deprives the defendant of a fair trial." *Bowling v. Commonwealth*, 80 S.W.3d 405, 410 (Ky. 2002). *Brady* is rooted in principles of "fair disclosure and does not create the right to discovery in a criminal trial." *Id.* As such, if the defense "could have – without the Commonwealth's assistance or permission" – discovered the evidence, there is no *Brady* violation. *Id.*

Here, the Commonwealth responded that inmate CHIRPS are available to anyone with an open records act request to the jail, or by issuing a subpoena to the jail. Coleman did not contest that fact, and it was repeated in the trial court's order denying Coleman's motion for a new trial. If Coleman could have obtained the CHIRPS from the jail at any time before, during, or after the trial, it was not an abuse of discretion for the trial court to find that the CHIRPS did not constitute a *Brady* violation. Moreover, we note, "reversal is required only where 'there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). This high bar was not reached; there is no argument to support the presumption that a few texts from Clarey would be so strong as to create a "reasonable probability" that the trial result would have been different.

## I. The trial court erred in denying an evidentiary hearing on Coleman's CR 60.02 motion, and we remand for an evidentiary hearing and/or additional findings.

In August 2022, Coleman submitted a notarized CR 60.02 motion for an evidentiary hearing citing newly discovered evidence. With this motion, Coleman attached a personally verified statement from Shawn Thompson ("Thompson"), a former inmate housed with Hubbard, Clarey, and Coleman. In his statement, Thompson recounted a conversation he had with Hubbard about the attempted robbery in which Hubbard did not implicate Coleman. In his motion, Coleman explained he attempted to submit a notarized version of Thompson's statement but was unable to get a notary while incarcerated before Thompson's release. Coleman also made explicit legal arguments – pursuant to KRE 801, 803, 804, and KRE 613 – that asserted Thompson's statements were excepted from the evidentiary hearsay rule and thereby admissible.

In January 2023, Coleman supplemented his CR 60.02 motion with two affidavits from Thompson gathered by a DPA investigator. Thompson's first affidavit repeated the assertions he made in his previous statement – that Hubbard did not implicate Coleman when he discussed the crime. In a second affidavit, Thompson recounted a conversation he had with Clarey in which Clarey admitted planning the robbery and that Coleman did not know Hubbard had a handgun. Again, Coleman made legal arguments as to admissibility of the two affidavits.

In February 2023, Coleman again supplemented his CR 60.02 motion and included an affidavit from Clarey gathered by a DPA investigator. In this affidavit, Clarey admitted to planning and perpetrating the attempted robbery with Hubbard, but stated Coleman "did not know the robbery was going to take place."

In March 2023, the trial court overruled the CR 60.02 motion without an evidentiary hearing. This order stated that

> [Coleman] has submitted an affidavit from co-defendant, [] Clarey, stating that [Coleman] did not participate in the planning of the robbery, and a statement of a former cellmate of co-defendants stating that [] Clarey told him that [Coleman] did not participate in the planning of the robbery.
>
> . . .
>
> The statements of co-defendant Clarey do not qualify defendant for the relief requested under CR 60.02. The court does not find defendant's arguments to be sufficient reason to modify the judgment in this case.

We review the denial of a CR 60.02 motion under an abuse of discretion standard. *White v. Commonwealth*, 32 S.W.3d 83, 86 (Ky. App. 2000) (citing *Brown v. Commonwealth*, 932 S.W.2d 359, 361 (Ky. 1996)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted).

The affidavit from Clarey and the second affidavit from Thompson referencing a conversation with Clarey support Coleman's claims of innocence. However, they are not "newly discovered" evidence. During his trial, Coleman called Clarey to testify, then as discussed above, withdrew that request. "Newly discovered evidence is evidence that could not have been obtained at the time of trial through the exercise of reasonable diligence." *Foley v. Commonwealth*, 425 S.W.3d 880, 887 (Ky. 2014) (internal quotation marks omitted) (citing *Commonwealth v. Harris*, 250 S.W.3d 637, 642 (Ky. 2008) and *Sanders v. Commonwealth*, 339 S.W.3d 427, 437 (Ky. 2011)). Clearly, Clarey's testimony could have been obtained at the time of trial. Further, CR 60.02 motions afford special and extraordinary relief *not available in other proceedings*. *McQueen v. Commonwealth*, 948 S.W.2d 415, 416 (Ky. 1997). Again, Clarey's testimony was available at Coleman's trial but not utilized. The trial court did not abuse its discretion in finding the statements from Clarey and the statements referencing conversations between Clarey and Thompson did not qualify Coleman to post-conviction relief pursuant to CR 60.02.

However, the order overruling Coleman's CR 60.02 motion did not address Coleman's originating argument dealing with the conversations between Thompson and *Hubbard*, *i.e.*, the order did not mention or discuss Thompson's personally verified statement filed in August 2022, Thompson's first affidavit filed

in January 2023, nor Coleman's legal arguments as to why both those statements qualify as exceptions to the hearsay rules of evidence. The order only referenced the second affidavit filed in January 2023 (that pertained to conversations between Thompson and *Clarey*) and Clarey's affidavit filed in February 2023.

Coleman's CR 60.02 claim was in part rooted upon conversations with *Hubbard*, not conversations with Clarey. We cannot review the trial court's findings and conclusions for an abuse of discretion without first having those findings and conclusions. Here, the trial court did not address Coleman's original argument comprised of statements impeaching *Hubbard*.

Therefore, we remand for further findings and/or an evidentiary hearing on Thompson's personal statement filed August 2022 and Thompson's first affidavit relating to a conversation with Hubbard filed in January 2023, and Coleman's contention that those statements are admissible exceptions to the hearsay rules of evidence.

## III. CONCLUSION

In light of the foregoing, we AFFIRM Coleman's conviction and sentence. We AFFIRM the July 2022 order denying a new trial. However, finding the trial court did not fully address Coleman's CR 60.02 motion, we REVERSE and REMAND for an evidentiary hearing and/or additional findings related to that motion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Molly Mattingly
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General
Frankfort, Kentucky